# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

CITIZENS PROTECTING MICHIGAN'S CONSTITUTION v SECRETARY OF STATE

Docket No. 157925. Argued July 18, 2018 (Calendar No. 1). Decided July 31, 2018.

Citizens Protecting Michigan's Constitution (CPMC), Joseph Spyke, and Jeanne Daunt sought a writ of mandamus in the Court of Appeals ordering that defendants, the Secretary of State and the Board of State Canvassers (the Board), reject an initiative petition filed by intervening defendant Voters Not Politicians (VNP) to place on the November 2018 general election ballot a proposed amendment of Article 4, § 6 of the 1963 Michigan Constitution that would create an independent citizens commission to oversee legislative redistricting. Article 4, § 6 of the 1963 Michigan Constitution established a commission to regulate legislative redistricting, but the Supreme Court subsequently declared that provision was not severable from apportionment standards that were unconstitutional; accordingly, in more recent years, the Legislature has overseen redistricting. VNP's proposal sought to bring the commission in line with constitutional requirements and revive its authority to set redistricting plans for the state house, state senate, and federal congressional districts. VNP gathered sufficient signatures for the petition to be placed on the ballot, but before the Board could certify the petition, plaintiffs sought a writ of mandamus directing the Secretary of State and the Board to reject the VNP proposal, arguing that the proposal was not an "amendment" of the Constitution that could be proposed by petition under Article 12, § 2 of the 1963 Michigan Constitution but rather was a "general revision" of the Constitution that could only be enacted through a constitutional convention under Article 12, § 3. VNP and other parties moved to intervene as defendants and to file a cross-complaint seeking a writ of mandamus to require that the proposal be placed on the ballot. The Court of Appeals, CAVANAGH, P.J., and K. F. KELLY and FORT HOOD, JJ., rejected plaintiffs' requested relief and granted the relief sought by intervening defendants, ordering the Secretary of State and the Board to take all necessary measures to place the proposal on the ballot. ___ Mich App ___ (2018) (Docket No. 343517). The Court of Appeals held that the proposal was an amendment rather than a revision because no fundamental government operations would be altered: the proposal would continue the redistricting commission, with modifications, already in the Constitution; the proposal involved a single, narrow focus—the independent citizens redistricting commission; and the Supreme Court would retain control over challenges to redistricting plans. CPMC sought leave to appeal in the Supreme Court and requested a stay of proceedings so that the Board would not certify the proposal while the case remained pending. The Supreme Court denied the motion for a stay but granted leave to appeal to consider whether the proposal was eligible for placement on the ballot as a voter-initiated

constitutional amendment under Article 12, § 2, or whether it was a general revision of the Constitution and therefore ineligible for placement on the ballot. ___ Mich ___ (2018).

In an opinion by Justice VIVIANO, joined by Justices MCCORMACK, BERNSTEIN, and CLEMENT, the Supreme Court *held*:

A voter-initiated amendment under Const 1963, art 12, § 2 is permissible if it proposes changes that do not significantly alter or abolish the form or structure of the government in a manner equivalent to creating a new constitution. Because VNP's proposal would leave the form and structure of the government essentially as it was envisioned in the 1963 Constitution, it was not equivalent to a new constitution and was therefore a permissible amendment under Article 12, § 2. Accordingly, the judgment of the Court of Appeals was affirmed.

1. Const 1963, art 1, § 1 provides that all political power is inherent in the people. The people have chosen to retain for themselves, in Const 1963, art 12, § 2, the power to initiate by petition proposed constitutional amendments that, if various requirements are met, will be placed on the ballot and voted on at an election. Specifically, Const 1963, art 12, § 2 requires every petition to include the full text of the proposed amendment and to be signed by registered electors of the state equal in number to at least 10% of the total votes cast for Governor in the most recent general gubernatorial election. Once the person authorized by law to receive the petition determines that the petition signatures were valid and sufficient, the proposed amendment is placed on the ballot. The Constitution also provides, in Const 1963, art 12, § 3, that the question of a general revision of the Constitution shall be submitted to the electors of the state every 16 years and at such times as may be provided by law.

2. In construing a constitutional provision, the objective is to determine the original meaning of the text to the people at the time of ratification using the rule of common understanding. To help discover the common understanding, constitutional convention debates and the Address to the People, though not controlling, are relevant. The pertinent definitions of "amendment" in dictionaries from the time Article 12, § 2 and its predecessor article in the 1908 Constitution were ratified did not directly address the breadth of the change that could be made by amendment or provide any substantive limitations on amendments.

3. The Michigan caselaw construing the meaning of the term "amendment" in Article 12, § 2 was not controlling. In *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273 (2008), aff'd in result only 482 Mich 960 (2008), the Court of Appeals held that, in order to determine whether a proposal effects a "general revision" of the Constitution rather than an amendment of it, the Court must consider both the quantitative nature and the qualitative nature of the proposed changes, specifically taking into account not only the number of proposed changes or whether a wholly new constitution is being offered but also the scope of the proposed changes and the degree to which those changes would interfere with or modify the operation of government. In reaching this conclusion, the Court relied, in part, on *Kelly v Laing*, 259 Mich 212 (1932), and *Sch Dist of City of Pontiac v City of Pontiac*, 262 Mich 338 (1933), and also on cases from other jurisdictions. However, *Laing* was clearly distinguishable because, while it addressed the distinction between a "revision" and an "amendment," it did so in the context of a city charter under the Home Rule City Act, MCL 117.1 *et seq.*, and that discussion was unnecessary to resolving the case, and *Pontiac Sch Dist* summarily rejected the argument that a

proposed amendment amounted to a revision without any discussion of the text of the governing constitutional provision or citation of any authority. Notably, the distinction between an amendment and a revision was contained only in the parties' arguments to the Court; speaking for itself, the *Pontiac* Court did not actually embrace a dichotomy between amendments and revisions but simply concluded that the proposal was not so dramatic a change as to "render it other than an amendment." At most, *Pontiac* suggested that there might be undefined limitations on what could be achieved by an amendment. In *Citizens*, the Michigan Supreme Court had an opportunity to resolve the case under the amendment/revision dichotomy but declined to do so, affirming the result only and fracturing on the reasoning. The Court of Appeals again addressed this issue in *Protect Our Jobs v Bd of State Canvassers*, unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828), which involved a CPMC challenge to a proposal on the same grounds it asserted in *Citizens* and in this case: that the proposal was a general revision of the Constitution under Article 12, § 3. The Court of Appeals rejected CPMC's challenge, using the "qualitative and quantitative" standard from *Citizens* and concluding that although the proposal might affect various provisions and statutes, it was limited to a single subject matter and changed only two sections of the Constitution, whereas the proposal in *Citizens* sought to replace vast portions of the Constitution and massively modify the structure and operation of Michigan's government. However, on appeal, the Supreme Court did not order briefing on the issue and did not address it.

4. The predecessor of Const 1963, art 12, § 2, which was ratified as Const 1908, art 17, § 2, initially gave the Legislature a veto over voter-initiated amendments before the election at which the proposal would appear on the ballot and allowed the Legislature to submit alternative or substitute amendments. However, the legislative veto was deleted by amendment in 1913. That change, which removed the clearest and most significant substantive check on the petition power, counseled against finding atextual limitations on voter-initiated amendments when construing Const 1963, art 12, § 2. The critical limitation in Const 1963, art 12, § 2, considering the amount of discussion it prompted at the 1961–1962 convention, was instead the procedural requirement of obtaining a certain number of signatures. A proposal at the convention that would have made it progressively easier to obtain enough signatures as the population increased was struck after a delegate argued that the voter-initiated amendments should not be too easy to accomplish because amendments, unlike statutory matter, should be important enough to merit inclusion in a constitution. Thus, the convention decided to keep voter-initiated amendments difficult because amendments, like the Constitution itself, were intended to deal with serious matters. Accordingly, the convention imposed what it viewed as the clearest and most stringent limitation on initiative amendments: a signature requirement.

5. The relevant substantive limitation on the scope of voter-initiated amendments arises from the text of Article 12, § 2 when read together with Article 12, § 3. By adopting these two different procedures for altering the Constitution, the framers intended that the mechanisms be different in some regard. The result of a constitutional convention called to consider a "general revision" under Article 12, § 3 is a proposed constitution or amendments adopted by the convention and proposed to the electors. By contrast, if approved, a voter-initiated amendment under Article 12, § 2 becomes part of the Constitution and abrogates or amends existing provisions of the Constitution. Consequently, an amendment does not replace a constitution in full, but simply adds to or abrogates specific provisions in an existing constitution. The fact that only the convention has the power to propose a constitution implies that an initiative amendment

cannot do so, and because this limitation would be meaningless if it only required a new constitution to be labeled as an amendment, it follows that an initiative amendment cannot propose changes that are tantamount to a new constitution. The phrase "general revision" supports this dichotomy between amendments and new constitutions. "General" means "dealing with all or the overall, universal aspects of the subject under consideration," and "revision" is relevantly defined as "the act or work of revising," which is how the term was characterized in *Laing* and how it was described at the 1908 constitutional convention. The "revision" is simply the process for reconsidering the Constitution as a whole; it is not, as some Court of Appeals opinions suggest, a particular document or proposed change. Accordingly, the distinction between the Article 12, § 3 convention process and the Article 12, § 2 amendment process was that the former could produce a proposed constitution, while the latter was limited to proposing less sweeping changes.

6. In determining whether a voter-initiated amendment is equivalent to a new constitution, the number of changes is not dispositive, as even a limited number of changes can have the effect of creating a new constitution. The most basic functions of a constitution are to create the form and structure of government, define and limit the powers of government, and provide for the protection of rights and liberties. These are the basic threads of a constitution, and when they are removed, replaced, or radically rewoven, the whole tapestry of the constitution may change. Therefore, changes that significantly alter or abolish the form or structure of our government, in a manner equivalent to creating a new constitution, are not amendments under Article 12, § 2. Contrary to the suggestion in *Pontiac Sch Dist*, it is not necessarily the impact on the operations of government that matters. Further, a change that recalibrates the relative power of the branches of government—such as limiting or taking away a specific power from one branch—is not, absent a significant effect on the structure of government, a change tantamount to a new constitution.

7. To determine whether VNP was proposing changes that would significantly alter or abolish the form or structure of our government in a way that is tantamount to creating a new constitution, it was necessary to examine Michigan law on redistricting and apportionment. Michigan's first three Constitutions gave the Legislature authority to redistrict. Because the Legislature did not always carry out this responsibility, two competing voter-initiated amendments were placed on the November 1952 ballot. One was approved, which wrote directly into the Constitution the then-existing alignment of seats in the Senate provided for in the 1952 amendment, added 10 seats to the House, and conferred upon the Board the obligation to draw new house districts if the Legislature failed to act. When the 1963 Constitution was ratified, it laid out a different framework for reapportionment and redistricting, under which the members of the Legislature were to be elected according to the districts in which they resided. The Constitution set forth apportionment factors and rules for individual districts, which were to be redrawn after each federal census in accordance with formulas that considered land area and population. The 1963 Constitution created a bipartisan commission on legislative apportionment to draw the relevant district lines, with the Secretary of State being required to furnish all necessary technical services and the Legislature being required to appropriate funds to enable the commission to carry out its activities. If the commission could not agree on a plan, commissioners could submit plans to the Supreme Court, which was required to determine which plan complied most accurately with the constitutional requirements and direct that the plan be adopted. Soon after the 1963 Constitution was ratified, the United States Supreme Court held in

*Reynolds v Sims*, 377 US 533 (1964), that the seats in both houses of a bicameral state legislature must be apportioned on a population basis and that geographical considerations could no longer play a role in apportionment if they produced population deviations between the districts, and it invalidated Michigan's apportionment rules shortly thereafter. As a result, the Michigan Supreme Court ordered the commission to adopt a new plan for redistricting and apportionment that complied with *Reynolds*. After several instances in which the commission failed to reach an agreement and required the Michigan Supreme Court's intervention, the Supreme Court ultimately held in 1982 that the commission was not severable from the provisions that had been declared unconstitutional, stating that changing how legislators are chosen was a decision of enormous importance that the people should make and suggesting that the people could do so by initiating a constitutional amendment. Because the initiative process was time-consuming and a plan was needed in the meantime, the Supreme Court appointed an individual to oversee the drawing of a redistricting and apportionment plan, but it stressed that this plan was merely a stopgap until the people or their representatives in the other two branches of government acted. It was not until 1996 that the Legislature codified apportionment standards and committed itself to drawing districts in the future. Thus, the last time the voters had direct input on this issue, they opted for apportionment and redistricting to be conducted by a commission, and the Legislature now exercises a power that the Constitution of 1963 expressly denied to it—to draw legislative districts—because the Constitution has never been amended to modify the unconstitutional provisions concerning apportionment and redistricting.

8. VNP's proposal would not significantly alter or abolish the form or structure of government in a manner that is tantamount to creating a new constitution. The VNP amendment would eliminate unconstitutional provisions that have remained in the Constitution and replace them with standards that reflect many of the same principles that took the place of those provisions, including adhering to federal law, requiring contiguous districts, respecting municipal boundaries, and seeking reasonable compactness. While the proposal also contained new items, such as considerations of partisan fairness, VNP's proposed standards would constitute neither a revolution in redistricting nor a transformation of Michigan's form or structure of government. Although the VNP proposal would affect the powers of all three branches of government by adding limiting language to the vesting clauses of each branch, these limitations were the result of VNP's attempt to harmonize its changes with the rest of the Constitution, and they would only place the proposal in jeopardy if the changes were equivalent to the creation of a new constitution. The present Constitution does not accord the Legislature any role in the redistricting or apportionment process; instead, as in VNP's proposal, a commission is placed in charge, and the commissions are materially similar. VNP's proposal seeks to ensure that the membership strikes a partisan balance and gives the Legislature a formal role in this process, while it had no such role in the 1963 Constitution's commission, but this slightly increased level of participation by the Legislature would not come at the expense of either of the other two branches of government. Although the Legislature has established the standards and framework for redistricting and drafted the plans since 1996, that role was a deviation from what the voters chose when they ratified the 1963 Constitution and was solely due to a judicial remedy that was crafted when the unconstitutional apportionment standards the commission was directed to implement were held not to be severable from the commission itself. The executive branch would not be significantly affected by the proposal, which only slightly expands the Secretary of State's responsibilities. Any additional powers the executive currently has in relation to redistricting flow not from the Constitution but from that same judicial remedy.

VNP's proposal would only modestly change the judicial branch's role in the redistricting process. The conclusion that VNP's proposal leaves the form and structure of the government essentially as it was envisioned in the 1963 Constitution is consistent with the expectations of key members of the 1961–1962 constitutional convention, the Michigan Supreme Court's suggestion in 1982 that Michigan's apportionment system could be addressed through an amendment to the Constitution initiated by the people, and the history of amendments to Michigan's Constitution, one of which expressly stripped the Legislature of the power to redistrict in certain circumstances and gave it to an agency in the executive branch. Further, other states have created independent redistricting commissions through voter-initiated amendments, and proposals to create such commissions have appeared on ballots through the initiative process numerous times in multiple states. Similarly, citizens in several states have employed initiatives to accomplish redistricting. Also persuasive was *Bess v Ulmer*, 985 P2d 979 (Alas, 1999), in which the Alaska Supreme Court held that a proposed amendment before the voters that would remove the reapportionment power from the executive branch, where the state's constitution had placed it, and transfer it to a "neutral body" was an amendment rather than a revision. The framers of Michigan's 1963 Constitution did not assign the apportionment power to any elected body, and so the effect of the changes here would be even less significant than those in *Bess*. Thus, the conclusion that VNP's proposal was a permissible voter-initiated amendment reflected the constitutional text, Michigan's historical experience, logic, and the wisdom of other states.

9. VNP's proposal did not amount to an abrogation under Const 1963, art 12, § 2 by requiring commission members to take an oath that is prohibited under the Oath Clause, Const 1963, art 11, § 1. In *Tedrow v McNary*, 270 Mich 332 (1935), this Court upheld a requirement that candidates for a certain public office file an affidavit or other evidence of their educational qualifications. Because the VNP proposal simply required candidates to attest to their qualifications for a position on the commission—a requirement *Tedrow* allowed—the proposal did not abrogate the Oath Clause by rendering it wholly inoperative.

Affirmed.

Chief Justice MARKMAN, joined by Justices ZAHRA and WILDER, dissenting, would have held that the VNP proposal constituted a general revision of the Constitution and thus was eligible for placement on the ballot only by the convention process of Const 1963, art 12, § 3. The people have made it reasonably clear that while ultimately they do possess the authority to restructure their own charter of government, as to the most fundamentally redefining of these changes, this restructuring will be done only after reflective and deliberative processes of decision-making. And Chief Justice MARKMAN was persuaded that the people would find fundamentally redefining a restructuring of their Constitution that deprived them and their chosen representatives of any role in the foundational process of our system of self-government: the process by which election districts are established, citizens are joined together or separated by political boundaries, and the building blocks of our governing institutions are determined. Inserted in its place by the VNP proposal would be the governance of 13 randomly selected people entirely lacking in any democratic or electoral relationship with the other 10 million people of this state or their elected representatives. In the end, the people must be allowed to do as they see fit; they can diminish the realm of governance of their representatives (and substitute in its place an "independent" and unaccountable commission) and they can dilute the relationship

between themselves and their representatives, but the people, as they have spoken through their Constitution, have also insisted that, before a change of this magnitude takes place, a serious and considered public conversation must first take place, affording opportunities for sustained and focused debate, give-and-take, compromise, and modification. Furthermore, references to the fact that the commission is to be "independent" obscure the fundamental change that the proposed measure would make to the people's Constitution; the great value of our Constitution is not the "independence" of public bodies but rather the separation of powers and the checks and balances that define relationships between public bodies and thereby limit and constrain their authority. While the VNP commission would indeed be "independent," most conspicuously, it would be "independent" of the people's representatives in the Legislature, independent of the people, and independent of the processes of self-government, especially the processes by which the people, in whose name both VNP and the majority purport to speak, exert their impact upon the "foundational" process of redistricting. Our constitutional heritage is poorly described by advocates of this proposal as one predicated upon the "independence" of public bodies; it is far better described as predicated upon the exercise of public authority that is limited, separated, subject to appropriate checks and balances, and accountable to the citizenry. The proposed new commission is grounded upon none of these. Whatever its merits, the creation of this commission would effect "fundamental" change upon both our constitutional charter and the system of government operating under this charter. It thus clearly warrants the kind of careful deliberation best afforded by the processes of constitutional "revision" set forth in Article 12, § 3 of this state's Constitution. For at least the past 85 years in Michigan, governing law concerning direct constitutional change has recognized that alternative constitutional procedures exist for instituting direct constitutional change and that determining which of these procedures is to be used in a particular instance requires an assessment of the qualitative nature of the proposed change, i.e., whether the changes would fundamentally alter the nature or operation of our government. Chief Justice MARKMAN disagreed with the majority's standard to the extent the majority held that a proposed change must be tantamount to creating a new constitution in order to be considered something other than an amendment. In this case, the VNP proposal would strike all that is currently in the Constitution regarding redistricting and would create an independent redistricting commission of a character effecting a fundamental change upon both the Constitution and the system of government operating under that Constitution. The Court of Appeals and the majority erred by assessing the nature of the change that would be effected by the VNP proposal by comparing the commission to be established by the VNP with the commission that had been created by the 1963 Constitution but thereafter was struck down. The pertinent question was not whether replacing the commission created by the 1963 Constitution with the VNP commission would fundamentally change the operation of government, but whether removing the power to redistrict from the Legislature and conferring that power onto the VNP commission would fundamentally change the operation of government because we are obligated to consider how the government is currently operating in order to make the necessary comparison, not how the government might once have operated, and it currently operates (as it has almost always operated in the history of our state) with the Legislature responsible for redistricting. The VNP proposal would affect the foundational power of government by removing altogether from the legislative branch authority over redistricting and consolidating that power instead in an independent commission made up of 13 randomly selected individuals who are not in any way chosen by the people, representative of the people, or accountable to the people, thereby effecting a fundamental alteration in the relationship between the people and their representatives. The proposal would also modify the prefatory language of Articles 4, 5,

and 6 of the 1963 Constitution pertaining to the legislative, executive, and judicial powers, suggesting that the commission itself is an entirely novel institution that would fundamentally alter the Constitution's separation of powers. Chief Justice MARKMAN therefore would have held that because the VNP proposal, if adopted, would fundamentally change the operation of the government, it was not an amendment that could be properly placed on the ballot by the initiative process of Const 1963, art 12, § 2. Rather, the decision of the Court of Appeals should have been reversed because the VNP proposal constituted a general revision that was only eligible for placement on the ballot through the convention process of Const 1963, art 12, § 3.

Justice WILDER, joined by Justice ZAHRA, dissenting, concurred in full with Chief Justice MARKMAN's dissent but wrote separately to address an alternative basis for rejecting the VNP proposal. Article 12, § 2 of the 1963 Constitution and MCL 168.482(3) both require that ballot proposals that would amend Michigan's Constitution republish any existing constitutional provisions that the proposed amendment would alter or abrogate. Article 4, § 6(2)(A)(III) of the VNP proposal, which is distinct from the qualifications for office listed in Article 4, § 6(1) of the VNP proposal, would require that applicants to the independent citizens redistricting commission attest under oath either that they affiliate or do not affiliate with one of the two major political parties. An applicant's failure to attest under oath regarding his or her political party affiliation would render that applicant ineligible for a position on the commission under VNP proposal, art 4, § 6(2)(D)(I). Because this oath requirement in the VNP proposal would abrogate Article 11, § 1 of the 1963 Constitution, which forbids requiring additional oaths or affirmations as a qualification for public office, VNP was required to republish that provision on its petitions. Strict compliance with the republication requirement was required, and it was uncontested that VNP failed to republish Article 11, § 1. Therefore, an order of mandamus should have issued directing the rejection of the VNP proposal.

©2018 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement

FILED July 31, 2018

STATE OF MICHIGAN

SUPREME COURT

CITIZENS PROTECTING MICHIGAN'S
CONSTITUTION, JOSEPH SPYKE, and
JEANNE DAUNT,

      Plaintiffs-Appellants,

v

No. 157925

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

      Defendants/Cross-
      Defendants-Appellees,

and

VOTERS NOT POLITICIANS BALLOT
COMMITTEE, d/b/a VOTERS NOT
POLITICIANS; COUNT MI VOTE, d/b/a
VOTERS NOT POLITICIANS; KATHRYN
A. FAHEY; WILLIAM R. BOBIER; and
DAVIA C. DOWNEY,

      Intervening Defendants/Cross-
      Plaintiffs-Appellees.

BEFORE THE ENTIRE BENCH

V<small>IVIANO</small>, J.

The question in this case is whether the voter-initiated amendment proposed by intervening defendant Voters Not Politicians (VNP) should be placed on the ballot. VNP launched a petition drive to propose an amendment that would reestablish a commission to oversee legislative redistricting. Plaintiffs brought suit to stop the petition from being placed on the ballot, making the now familiar argument that the proposed amendment is actually a "general revision" that can only be enacted through a constitutional convention.

We took this case to determine whether the VNP petition is a constitutionally permissible voter-initiated amendment under Const 1963, art 12, § 2. To answer this question, we must fulfill our Court's most solemn responsibility: to interpret and apply the pertinent provisions of our Constitution. After closely examining the text, structure, and history of the Constitution, we hold that, to be permissible, a voter-initiated amendment must propose changes that do not significantly alter or abolish the form or structure of the government in a manner equivalent to creating a new constitution. We reach this conclusion for the following reasons:

- The text of the relevant constitutional provisions, Const 1963, art 12, §§ 2 and 3, makes it clear that a constitutional convention is required to produce a new constitution. (See pages 20 through 31 of this opinion.)

- The primary substantive limitation in the text of the predecessor provision to Const 1963, art 12, § 2 originally imposed on voter-initiated amendments was removed more than 100 years ago. (See pages 20 through 22 of this opinion.)

- Our caselaw on this topic—undeveloped and largely not on point—fails to establish any controlling standard in this area. (See pages 12 through 19 of this opinion.)

In this case, VNP's amendment does not propose changes creating the equivalent of a new constitution:

- VNP's proposed redistricting commission is materially similar to the commission provided for in our current Constitution, and VNP's proposed redistricting standards are similar to the ones presently used. (See pages 38 through 44 of this opinion.)

- VNP's proposal does not substantially change the powers of the three branches of government when compared to where the people placed those powers in the 1963 Constitution. (See pages 44 through 50 of this opinion.)

- Finally, treating VNP's proposal as an amendment accords with the stated expectations of key delegates to the 1961-1962 constitutional convention, statements from this Court on this very topic, and the treatment of this issue by other states. (See pages 50 through 55 of this opinion.)

Therefore, we affirm the judgment of the Court of Appeals that VNP's proposal is a permissible voter-initiated amendment.

## I. FACTS AND PROCEDURAL HISTORY

VNP is a ballot-question committee. It filed with defendant Secretary of State the initiative petition at issue in this case. The initiative proposal would, among other things, amend Const 1963, art 4, § 6, which established a commission to regulate legislative redistricting. The commission prescribed by our present Constitution is inactive because this Court declared that it could not be severed from apportionment standards contained in the Michigan Constitution that had been held to be unconstitutional, as explained further below.[1] After that ruling, this Court oversaw redistricting until the Legislature

---

[1] *In re Apportionment of State Legislature—1982*, 413 Mich 96; 321 NW2d 565 (1982).

took control of the process. VNP's proposal would bring Michigan's constitutional redistricting standards in line with federal constitutional requirements and revive the redistricting commission's authority to set redistricting plans for the state house, state senate, and federal congressional districts.

A sufficient number of registered electors signed the petition for it to be placed on the November 2018 general election ballot. Before the Board of State Canvassers could certify the petition for placement on the ballot,[2] plaintiff Citizens Protecting Michigan's Constitution (CPMC), along with other plaintiffs,[3] filed the present complaint for a writ of mandamus directing the Secretary of State and the Board to reject the VNP proposal. CPMC argued that the proposal was not an amendment of the Constitution that could be proposed by petition under Const 1963, art 12, § 2; rather, the proposal amounted to a "general revision" of the Constitution and could be enacted only through a constitutional convention under Const 1963, art 12, § 3. The Court of Appeals granted the request by VNP and other parties[4] to intervene as defendants and to file a cross-complaint seeking a writ of mandamus requiring the proposal to be placed on the ballot.

In a unanimous published opinion, the Court of Appeals rejected plaintiffs' requested relief and granted the relief sought by intervening defendants, ordering the Secretary of State and the Board "to take all necessary measures to place the proposal on

---

[2] MCL 168.477.

[3] While multiple plaintiffs appear in the action, for ease of reading we will refer to CPMC alone.

[4] Again, we will refer only to VNP and not the other parties.

4

the November 2018 general election ballot."[5]  The Court noted that our courts have long distinguished between an "amendment" and a "revision."[6]  The former was a narrower concept focusing on specific changes to the Constitution, while the latter was a more comprehensive modification of fundamental government operations.[7]  To determine if a particular proposal changed the fundamental nature of the government, the Court of Appeals considered the quantitative and qualitative features of the proposal.[8]

Comparing the present proposal to those addressed in past cases, the Court observed that the proposal would continue, with modifications, the redistricting commission already in the Constitution (although not enforced).[9]  Also, the proposal "involve[d] a single, narrow focus—the independent citizen redistricting commission."[10]  While the proposal reduced this Court's oversight of redistricting plans from the level contemplated by the present Constitution, our Court would nonetheless retain control

---

[5] *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich App ___ (2018), order entered June 7, 2018 (Docket No. 343517).

[6] *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 343517) (*CPMC*); slip op at 15.

[7] *Id*. at ___; slip op at 16.

[8] *Id*. at ___; slip op at 16-17, citing *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 305; 761 NW2d 210 (2008), aff'd in result only 482 Mich 960 (2008).  This 2008 Court of Appeals case and its affirming order will be referred to as *Citizens* throughout this opinion.

[9] *CPMC*, ___ Mich App at ___, ___; slip op at 8 & n 21, 18-19.

[10] *Id*. at ___; slip op at 18.

over challenges to redistricting plans.[11]  Regarding quantitative considerations, the Court of Appeals noted the number of words the proposal would add to the Constitution (4,834) and the fact that 11 sections would be changed across 3 articles of the Constitution.[12] None of this, however, was enough to convince the Court that fundamental government operations would be altered.  Thus, the proposal was an amendment that could be brought by petition, as it had been.

CPMC sought leave to appeal here and requested a stay of proceedings below so that the Board would not certify the proposal while the case remained pending.  We denied the motion for a stay,[13] but we granted leave to appeal to consider "whether the proposal at issue is eligible for placement on the November 2018 general election ballot as a voter-initiated constitutional amendment under Const 1963, art 12, § 2, or whether it is a revision to the Constitution and therefore is ineligible for placement on the ballot."[14]

---

[11] *Id*. at at ___; slip op at 19.

[12] *Id*. at at ___; slip op at 20.

[13] *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich ___; 912 NW2d 181 (2018).

[14] *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich ___ (2018) (Docket No. 157925).

6

## II. STANDARD OF REVIEW

A lower court's decision on whether to grant a writ of mandamus is reviewed for an abuse of discretion.[15] To the extent that a request for a writ of mandamus involves questions of law, we review them de novo.[16]

## III. ANALYSIS

## A. CONSTITUTIONAL INTERPRETATION

Our Constitution is clear that "[a]ll political power is inherent in the people."[17] The people have chosen to retain for themselves, in Const 1963, art 12, § 2, the power to initiate proposed constitutional amendments that, if various requirements are met, will be placed on the ballot and voted on at election time. It has been observed that "there is no more constitutionally significant event than when the wielders of '[a]ll political power' under that document, Const 1963, art 1, § 1, choose to exercise their extraordinary authority to directly approve or disapprove of an amendment thereto. Const 1963, art 12, §§ 1 and 2."[18] In this case, we must determine the scope of the voters' power to initiate amendments.

---

[15] See *People ex rel King v Wayne Circuit Judge*, 41 Mich 727; 49 NW 925 (1879).

[16] *Bonner v City of Brighton*, 495 Mich 209, 221; 848 NW2d 380 (2014).

[17] Const 1963, art 1, § 1.

[18] *Blank v Dep't of Corrections*, 462 Mich 103, 150; 611 NW2d 530 (2000) (MARKMAN, J., concurring). Indeed, Michigan is one of the leading states when it comes to direct democracy reforms. In addition to retaining the right to amend the Constitution by direct initiative, the people of Michigan have also reserved the power to propose and enact statutes by initiative, Const 1963, art 2, § 9; to reject statutes by referendum, *id*.; and to recall elected officials, Const 1963, art 2, § 8. Michigan is one of only eight states whose people have retained each of these forms of direct democracy. See National Conference

In answering this question, we do not consider whether the proposed amendment at issue represents good or bad public policy.[19]  Instead, we must determine whether the amendment meets all the relevant constitutional requirements.[20]  There may be an "overarching right" to the initiative petition, "but only in accordance with the standards of the constitution; otherwise, there is an 'overarching right' to have public policy determined by a majority of the people's democratically elected representatives."[21]  In particular, we have stated that the "right [of electors to propose amendments] is to be exercised in a certain way and according to certain conditions, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution."[22]

---

of State Legislatures, *Initiative and Referendum States* <http://www.ncsl.org/research/elections-and-campaigns/chart-of-the-initiative-states.aspx> (accessed July 30, 2018) [http://perma.cc/H7PP-NHJQ]; National Conference of State Legislatures, *Recall of State Officials* <http://www.ncsl.org/research/elections-and-campaigns/recall-of-state-officials.aspx (accessed July 30, 2018) [http://perma.cc/3UVQ-CY7Y].  After a 1913 amendment removing legislative oversight of the initiative process, the initiative "has proven extremely popular," according to a study prepared for the Constitutional Convention Preparatory Commission, adding that "[i]t is among the most used of Michigan's devices for direct government."  McHargue, *Direct Government in Michigan* (1961), p 19.

[19] See *Mich United Conservation Clubs v Secretary of State*, 464 Mich 359, 368-369; 630 NW2d 297 (2001) (YOUNG, J., concurring).

[20] Cf. *id*. at 389 ("[T]he people's ability to decide [whether to retain a statute] by the referendum process is not infinite; rather, it is circumscribed by the limitations placed in the Michigan Constitution.").

[21] *Id*. at 393 (MARKMAN, J., concurring).

[22] *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918); see also *Protect Our Jobs v Bd of State Canvassers*, 492 Mich 763, 772; 822 NW2d 534 (2012) ("This Court has consistently protected the right of the people to amend their Constitution in this

Our inquiry here, then, is to determine the extent of the people's right to initiate constitutional amendments and whether any clear limitations may be found in the Constitution.[23] As with any constitutional provision, the objective of our interpretation " 'is to determine the text's original meaning to the ratifiers, the people, at the time of ratification.' "[24] The primary rule is that of " 'common understanding,' " as Justice COOLEY explained long ago:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed."[25]

---

way, while enforcing constitutional and statutory safeguards that the people placed on the exercise of that right.").

[23] Such a clear limitation could, for example, look like the one we addressed in *Mich United Conservation Clubs*, 464 Mich 359. In that case, we examined Const 1963, art 2, § 9, which states that the constitutional referendum power "does not extend to acts making appropriations for state institutions . . . ." We had little trouble deciding that an appropriation to the state police was, under the constitutional exemption, not subject to referendum. No analogous provision appears in Article 12, § 2.

[24] *People v Tanner*, 496 Mich 199, 223; 853 NW2d 653 (2014) (citation omitted).

[25] *Federated Publications, Inc v Bd of Trustees of Mich State Univ*, 460 Mich 75, 85; 594 NW2d 491 (1999), quoting 1 Cooley, *Constitutional Limitations* (6th ed), p 81 (quotation marks and citations omitted).

9

To help discover the "common understanding," this Court has observed "that 'constitutional convention debates and the address to the people, though not controlling, are relevant.' "[26]

## B. OVERVIEW OF THE AMENDMENT AND REVISION PROCESS

Three basic procedures allow for alterations of the Constitution. The first, not directly relevant here, provides for "amendments" proposed in the Senate or House and approved by two-thirds of the members in each chamber, then submitted to the voters for approval.[27] Const 1963, art 12, § 2 provides the second manner of altering the Constitution, which is the one VNP attempted here: "Amendments may be proposed to this constitution by petition of the registered electors of this state."[28] "Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast" for Governor in the most recent general gubernatorial election.[29] Once the "person authorized by law to receive such petition" determines that the petition signatures were valid and sufficient, the proposed amendment is placed on the ballot.[30] Finally, under

---

[26] *Tanner*, 496 Mich at 226, quoting *People v Nash*, 418 Mich 196, 209; 341 NW2d 439 (1983). Indeed, this Court has stated that convention records may be "highly valuable." *Tanner*, 496 Mich at 226 n 20. Of course, we recognize that this evidence cannot be used to contradict a limitation that appears in the constitutional text.

[27] Const 1963, art 12, § 1.

[28] Const 1963, art 12, § 2.

[29] *Id*.

[30] *Id*.

10

Const 1963, art 12, § 3, the third manner of changing the Constitution is by constitutional convention.[31] Every 16 years, "and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state"; if the voters vote in favor of performing a "general revision," a constitutional convention is convened for that purpose.[32]

We have explained that the adoption of the initiative power, along with other tools of direct democracy, "reflected the popular distrust of the Legislative branch of our state government."[33] While the right to propose amendments by initiative must be done according to constitutional requirements, we have observed that "it may be said, generally, that [the right] can be interfered with neither by the legislature, the courts, nor

---

[31] Const 1963, art 12, § 3.

[32] *Id*.

[33] *Woodland v Mich Citizens Lobby*, 423 Mich 188, 218; 378 NW2d 337 (1985) (" 'The initiative found its birth in the fact that political parties repeatedly made promises to the electorate both in and out of their platforms to favor and pass certain legislation for which there was a popular demand. As soon as election was over their promises were forgotten, and no effort was made to redeem them. These promises were made so often and then forgotten that the electorate at last through sheer desperation took matters into its own hands and constructed a constitutional procedure by which it could effect changes in the Constitution and bring about desired legislation without the aid of the legislature.' "), quoting *Hamilton v Secretary of State*, 227 Mich 111, 130; 198 NW 843 (1924); see also 1 *Proceedings and Debates of the Constitutional Convention of the State of Michigan 1907-1908*, p 590 ("The trouble is not with the representative government, it is with this eternal mis-representative government . . . . We want the initiative on constitutional amendments why? Because we want the legislature to sometimes pay some attention to the voice of the people, and . . . this right in the people is necessary to a proper regulation of the legislature.") (statement of Delegate Frank Pratt).

the officers charged with any duty in the premises."[34]   Indeed, we have held that Article

12, § 2 is self-executing,[35] although the Constitution explicitly allows the Legislature to

prescribe by law procedures regulating the initiative.[36]

## C.  LIMTIATIONS ON VOTER-INITIATED AMENDMENTS

The scope of the initiative amendment process and its relation to the "general

revision" process is at the heart of this case.   How extensive can a voter-initiated

amendment be, and does the Constitution place any relevant subject matter limitations on

such amendments?

## 1.  CASELAW

We will begin with our caselaw on this topic, which ultimately proves

unilluminating.  There is no controlling authority from this Court construing the meaning

of the term "amendment" in Article 12, § 2.  The issue has been raised twice in the last 10

years, but neither case yielded a majority opinion from this Court construing the term

"amendment" in this context.  In *Citizens*,[37] the Court of Appeals addressed this issue for

the first time.  In that case, a group called Reform Michigan Government Now! (RMGN)

submitted an initiative petition proposing a vast array of changes to Michigan's

---

[34] *Scott*, 202 Mich at 643.

[35] *Ferency v Secretary of State*, 409 Mich 569, 590-591; 297 NW2d 544 (1980).

[36] *Consumers Power Co v Attorney General*, 426 Mich 1, 7-8; 392 NW2d 513 (1986).

[37] *Citizens*, 280 Mich App 273.

12

Constitution.[38]  CPMC argued that "the RMGN initiative petition [was] not eligible to be placed on the ballot because it [was] not merely an 'amendment' to the constitution, but [was] a 'general revision' . . . that only a constitutional convention [could] accomplish."[39] The Court distinguished an "amendment" from a "general revision" and held:

> [I]n order to determine whether a proposal effects a "general revision" of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider both the quantitative nature and the qualitative nature of the proposed changes. More specifically, the determination depends on not only the number of proposed changes or whether a wholly new constitution is being offered, but on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government.[40]

In reaching this conclusion, the court reviewed: (1) the text of the constitutional provisions at issue;[41] (2) two cases from this Court—one interpreting a city charter under the Home Rule City Act, MCL 117.1 *et seq*.,[42] and one interpreting the predecessor provisions of the 1908 Michigan Constitution;[43] and (3) several cases from other

---

[38] By the Court of Appeals' count, the RMGN initiative petition sought to alter four separate articles of the Michigan Constitution and proposed at least 29 separate changes. *Id*. at 279-281 (listing the proposed changes).

[39] *Id*. at 281-282.

[40] *Id*. at 305.

[41] The Court of Appeals did not do an extended exegesis of the constitutional text and concluded that dictionary definitions from the time of ratification, "[w]hile somewhat helpful to the analysis, . . . do not completely reveal the differentiation that was intended by the framers of the constitution from their use of the words 'amendment' and 'revision.' " *Id*. at 295.

[42] See *Kelly v Laing*, 259 Mich 212; 242 NW 891 (1932).

[43] See *Sch Dist of City of Pontiac v City of Pontiac*, 262 Mich 338; 247 NW 474 (1933).

jurisdictions, including two leading cases decided by the California Supreme Court.[44] The Court "agree[d] with the reasoning of these decisions" and found them "to be consistent with Michigan law as stated in *Laing* and *Pontiac School Dist*."[45]

Much of the Court of Appeals' analysis hinged on *Laing* and *Pontiac Sch Dist*, so it is worth considering whether those cases did, in fact, establish the above standard, and whether they are binding or persuasive authority. Despite the Court of Appeals' reliance on *Laing* and *Pontiac Sch Dist*, we find these cases to be of limited value on this topic. *Laing* is clearly distinguishable because, while it addressed the distinction between a "revision" and an "amendment," it did so in the context of a city charter under the Home Rule City Act.[46] And, in any event, its discussion was unnecessary to resolving the case, since it occurred immediately after the Court's holding that "[t]he petition on its face is not in the form required by law, and raised no duty in defendants to provide for an election."[47] We agree with the Solicitor General that this case is not binding; however, the Court's opinion does give some insight into the plain meaning of the terms "amendment" and "revision" 24 years after the 1908 Constitution was ratified:

> "Revision" and "amendment" have the common characteristics of working changes in the charter and are sometimes used inexactly, but there is an essential difference between them. Revision implies a re-examination

---

[44] See *McFadden v Jordan*, 32 Cal 2d 330; 196 P2d 787 (1948); *Livermore v Waite*, 102 Cal 113, 118-119; 36 P 424 (1894).

[45] *Citizens*, 280 Mich App at 304-305.

[46] *Laing*, 259 Mich at 214.

[47] *Id*. at 216.

of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose. Basically, revision suggests fundamental change, while amendment is a correction of detail.[48]

Nine months later, in *Pontiac Sch Dist*, this Court again addressed the distinction between an "amendment" and a "revision," this time in the context of a challenge to an amendment of the Constitution proposed under Article 17, § 2 of the 1908 Constitution, the predecessor to Article 12, § 2 of the 1963 Constitution.[49] Without any discussion of the text of the provision, or citation of any authority (notably absent was any citation of *Laing*, decided less than a year earlier), the Court summarily rejected the argument that the amendment amounted to a revision because it "does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment by way of an addition to the Constitution."[50] It is hard to glean much meaning from this statement, since the Court did not purport to set forth a standard to govern this question

---

[48] *Id*. at 217. *Laing* is noteworthy for another reason: in further dicta, the Court indicated that it considered an increase in the number of city commissioners and a change in the way their districts were drawn as properly the subject of an amendment to the city charter. See *id*. at 222 ("Speaking generally and without stopping to examine the precise effect of those at bar, it is evident that a proposal to increase the number of commissioners from five to nine, with the machinery necessary therefor [i.e., abolishing the existing districts so the new commission members could be elected by wards], would merely be a change of detail and, therefore, an amendment.").

[49] *Pontiac Sch Dist*, 262 Mich at 345.

[50] *Id*.

but instead merely rejected the argument in the form that it was presented. Notably, the distinction between an amendment and a revision was contained only in the parties' arguments to the Court; speaking for itself, the Court did not actually embrace a dichotomy between "amendments" and "revisions" but simply concluded that the proposal was not so dramatic a change as to "render it other than an amendment . . . ."[51]

In *Citizens*, this Court had an opportunity to resolve the case under the amendment/revision dichotomy but declined to do so, affirming the result only and fracturing on the reasoning. Three justices gave a qualified endorsement of the Court of Appeals' articulation of the distinction between an "amendment" and a "general revision" of the Constitution.[52] The remaining four justices declined to adopt the Court of Appeals' standard. Three of the four agreed with the order affirming, but did so based on grounds not addressed by the Court of Appeals, namely, that "a proposal of this extraordinary scope and multitude of unrelated provisions clearly cannot be reasonably communicated to the people in 'not more than 100 words,' " as required by Article 12, § 2.[53] By its willingness to dispose of the case on the alternative ground that "[t]his language establishes a clear limitation on the scope of the constitutional amendments under [Article 12, § 2],"[54] the statement by this grouping of justices may be read as an

---

[51] *Id.*

[52] *Citizens*, 482 Mich at 964 (CORRIGAN, J., concurring, joined by TAYLOR, C.J., and YOUNG, J.) ("On the basis of my review, which was limited by time constraints, I do not see a clear error in the Court of Appeals articulation . . . .").

[53] *Id*. at 961 (CAVANAGH, WEAVER, and MARKMAN, JJ., concurring).

[54] *Id*. at 960.

implicit recognition that the "amendment/general revision" dichotomy did not provide such a clear limitation, at least not under the Court of Appeals' standard.[55]   Justice KELLY's dissent questioned the test developed by the Court of Appeals and lamented that our failure to construct a clearer test left the state of the law unsettled.[56]

The Court of Appeals again confronted this issue in *Protect Our Jobs v Bd of State Canvassers*.[57]   As the Court summarized it, the ballot proposal at issue was narrow, providing in one constitutional section the "people with the right to organize and bargain collectively" with public and private employers, to the extent not preempted by federal law, and in another section "protecting the rights of classified civil service employees to bargain collectively concerning all conditions and aspects of employment except promotions."[58]   CPMC challenged the proposal on the same grounds it asserted in

---

[55] One member of this grouping wrote separately to make this point explicitly.  See *id*. at 962 (WEAVER, J., concurring) ("The Court of Appeals opinion is an example of judicial activism—of the unrestrained, mistaken use of the power of interpretation. . . .   It wrongly creates a 'judicial veto' over future voter-initiated proposed amendments by petition even if such a proposed amendment were a one (1)-issue, single-purpose amendment whose 'not more than 100 words' purpose statement for printing on the ballot would easily be sufficient, understandable, impartial, and true.").  The Court of Appeals, for its part, conceded that it was unable "to define with nicety the line of demarcation between an 'amendment' and a 'general revision.' "  See *Citizens*, 280 Mich App at 305 (cleaned up).

[56] *Citizens*, 482 Mich at 964, 966 (KELLY, J., dissenting).

[57] *Protect Our Jobs v Bd of State Canvassers*, unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828).

[58] *Id*. at 1-2.

*Citizens* and is asserting in this lawsuit, i.e., that it was a general revision of the Constitution under Article 12, § 3.

The Court of Appeals rejected CPMC's challenge, using the "qualitative and quantitative" standard from its decision in *Citizens* and concluding that although the proposal might affect "various provisions and statutes," it was "limited to a single subject matter" and changed only two sections of the Constitution.[59]  By contrast, the RMGN proposal in *Citizens*

> sought to replace vast portions of the constitution and massively modify the structure and operation of Michigan's government.  The initiative proposal here is far more akin to a correction of detail than a fundamental change, when viewed in the proper context of the constitution as a whole.  See *Laing v Kelly*, 259 Mich 212, 217; 242 NW 891 (1932).[60]

This Court did not order briefing on the issue[61] and our opinion declined to address it.[62]

Thus, we could locate no controlling authority from this Court construing the meaning of the term "amendment" in Article 12, § 2.  At most, *Pontiac* suggests there may be undefined limitations on what can be achieved by an amendment.  Moreover, our caselaw lacks a detailed examination of this issue, especially one that conducts the proper analysis by examining the constitutional text.  Perhaps as a result of veering from the text, the rather vague standard that has developed below affords courts considerable

---

[59] *Id*. at 2.

[60] *Id*. at 2-3.

[61] *Protect Our Jobs v Bd of State Canvassers*, 492 Mich 862 (2012).

[62] See *Protect Our Jobs*, 492 Mich 763.

discretion in this area.[63]  We believe the constitutional text provides a clearer standard,

which we turn to now.

---

[63] The Chief Justice's dissent does not engage in a textual analysis of our Constitution—it does not, for example, directly examine the meanings of the relevant terms, but rather looks to what a few cases have said, generally, about those terms.  However, "a judge must remember 'above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put upon it.' "  Markman, *On Interpretation and Non-Interpretation*, 3 Benchmark 219, 220 (1987), quoting Douglas, *Stare Decisis*, 49 Colum L Rev 735, 736 (1949); see also *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 561 n 4; 737 NW2d 476 (2007) (recognizing that "the actual language of the proposed constitution constitutes the best evidence of the 'common understanding' " of the ratifiers).

Even so, we believe the Chief Justice's dissent engages in revisionist legal history when it asserts that our precedents in this area have established "longstanding standards" on this point that are "consistent and compatible with each other, as well as with what is required by our Constitution . . . ." *Post* at 12.  Indeed, the opinion labors to give its rule some provenance by repeatedly citing the age of the cases he relies upon, rather than focusing on their content.  See *post* at 11 ("[F]or at least the past 85 years in Michigan, governing law concerning direct constitutional change has been characterized by the following . . . ."); *post* at 16 ("[O]ur Court would recognize, as [it has] for the past 85 years . . . ."); *post* at 17 (referring to "the standard set forth by our precedents over 85 years ago"); *post* at 18 (referring to "the standard set forth by our precedents over the course of 85 years").  And, for good measure, the dissent accuses the majority of altering these longstanding standards.  But if the standard set forth in *Laing* and *Pontiac Sch Dist* and the Court of Appeals decisions in *Citizens* and *Protect Our Jobs* was so clear and longstanding on this point, one wonders why this Court refused to adopt it in 2008 in *Citizens*, instead issuing a highly unusual order leaving this area of law in a state of limbo.  In any event, as already mentioned, *Laing* and *Pontiac Sch Dist* did not review the text of the Constitution or purport to establish any constitutional standard at all on this point.  In light of this, it would be euphemistic to say that these cases have created a judicial gloss supporting the dissent's reasoning—instead, they appear to us more like a spray-on tan.

If it is bad to depart from the plain language of our Constitution on the basis of a judicial gloss that is binding precedent, how much worse it must be to do so on the basis of the spotty and inapposite authority the dissent relies upon in this case.  Cf. Markman, *Resisting the Ratchet*, 31 Harv J L & Pub Pol'y 983, 985 (2008) ("[T]o read the law

## 2. ARTICLE 12, § 2

The textual analysis begins with examining the meaning of "amendment" as used in the text.[64] "Amendment" is relevantly defined as "an alteration of a legislative or deliberative act or in a constitution; a change made in a law, either by way of correction or addition," or "the correction of an error in a writ, record, or other judicial document."[65] The definition does not directly speak to the breadth of the change that can be made by amendment or provide any substantive limitations on amendments.

---

consistently with its language, rather than with its judicial gloss, is not to be 'harsh' or 'crabbed' or 'Dickensian,' but is to give the people at least a fighting chance to comprehend the rules by which they are governed."). Repeatedly calling these cases the "*best* and most *authoritative* and most *consistent*" precedents of this Court, *post* at 9 n 2, the "most compelling precedents of this state," *post* at 9 n 2, and the "*best* and the most *enduring* relevant precedents of this state," *post* at 19 n 9, does not make them so, even if with the use of italics.

[64] Because the predecessor to Article 12, § 2 first appeared in the 1908 Constitution, Const 1908, art 17, § 2, and was retained in our current Constitution, which was ratified in 1963, we will look to dictionaries from those periods to help interpret the term.

[65] *The Century Dictionary: An Encyclopedic Lexicon of the English Language* (1911), p 173; see also *The American Heritage Dictionary of the English Language* (1969) ("Amendment" is "[a] correction" or "a revision or change."); *Webster's Third New Int'l Dictionary* (1966): ("Amendment" is the "act of amending," the "correction of a fault or faults," or "the process of amending[.]"); *The Random House Dictionary of the English Language* (1966) ("Amendment" is "the act or state of amending or the state of being amended," "an alteration of or addition to a motion, bill, constitution, etc.," or "a change made by correction, addition, or deletion[.]"). If "amendment" were considered a term of art, the dictionary definition would not be materially different. See *Black's Law Dictionary* (2d ed, 1910) ("Amendment" is "[t]he correction of an error" in any proceeding at law, or "[a]ny writing made or proposed as an improvement of some principal writing."); see also *Ballentine's Law Dictionary* (3d ed, 1969) ("Amendment" means "[a] correction or revision of a writing to correct errors or better to state its intended purpose.").

With regard to limitations on the scope of amendments, the text of the predecessor provision to Article 12, § 2 was meaningfully changed soon after its ratification in 1908. When it was ratified, the Constitution gave the Legislature a veto over voter-initiated amendments before the election at which the proposal would appear on the ballot, and the Legislature could also submit alternative or substitute amendments.[66]  Yet despite the Legislature's considerable oversight, the framers of the Constitution nonetheless thought that "the effect of this provision [i.e., the initiative provision] will be the submission to a vote of the electors of *practically all* amendments petitioned for."[67]  In a telling passage of the Address to the People, the framers explained that legislative oversight of the amendments proposed by initiative was a crucial factor to the convention:

> The convention realized the far-reaching effect that each amendment to the constitution may have beyond the immediate purpose intended by it, and it was deemed essential in so important a matter as changing the fundamental law of the state that the very greatest care should be required in both the form and substance of amendments to it.  *Such care is secured by requiring the amendments proposed to pass the scrutiny of the legislature.*[68]

---

[66] Const 1908, art 17, § 2 ("All petitions for amendments filed with the secretary of state shall be certified by that officer to the legislature at the opening of its next regular session; and when such petitions for any one proposed amendment shall be signed by not less than the required number of petitioners, he shall also submit the proposed amendment to the electors at the first regular election thereafter, *unless the legislature in joint convention shall disapprove* of the proposed amendment by a majority vote of the members elected.  The legislature may, by a like vote, submit an alternative or a substitute proposal on the same subject.") (emphasis added).

[67] Address to the People, Const 1908, art 17, §§ 2 and 3 (1908), p 64 (emphasis added).

[68] *Id.* (emphasis added).

21

But even the legislative veto—the clearest and most significant substantive check on the petition power—was deleted by amendment in 1913.[69]  In light of this history, we should be wary of finding atextual limitations on voter-initiated amendments.

The critical limitation in Article 12, § 2—at least based on the amount of discussion it prompted at the 1961–1962 convention—is instead the *procedural* requirement of obtaining a certain number of signatures.  Originally, signatures in a number equal to 20 percent of the vote at the most recent election for secretary of state had to be collected, but in 1913 this threshold was reduced to 10 percent of the votes for Governor at the most recent general gubernatorial election.[70]  The importance of this restriction in the constitutional framework was made abundantly clear by the framers of the 1963 Constitution, who engaged in a spirited debate regarding the signature requirement.  At the convention, it was proposed, and briefly added to the constitution under consideration, that the 10 percent requirement be amended to include "or 300,000 such registered electors, whichever shall be less."[71]  The effect would have been to make it progressively easier to obtain enough signatures as the population increased.  Delegate J. Harold Stevens successfully recommended striking this addition, arguing that the

---

[69] See *Direct Government*, p 19 (discussing the 1913 amendment); see also Fairlie, *The Referendum and Initiative in Michigan*, 43 Annals of Am Acad of Pol and Soc Sci 146, 153 (Sept 1912) (observing that for a few years after the 1908 Constitution was in place, no amendments were proposed, and speculating that this was "due in part to the restrictions in the method provided").

[70] See Const 1908, art 12, § 2.

[71] 2 Official Record, Constitutional Convention 1961, p 2459 (capitalization altered).

voter-initiated amendments should not be too easy to accomplish.[72]  But his concern reflected his belief that initiative amendments should not be akin to "statutory matter."[73] He did not want to debase the Constitution by cluttering it with trivial amendments—in other words, he wanted amendments to be important enough to merit inclusion in a constitution.  He was not, then, suggesting that initiative amendments should be limited to trivial matters; quite the contrary.[74]

Thus, the convention decided to keep voter-initiated amendments difficult *because* amendments, like the Constitution itself, were intended to deal with serious matters.  The convention accomplished its goal by imposing what it viewed as the clearest and most stringent limitation on initiative amendments: a signature requirement.[75]

---

[72] *Id*. at 2462-2465.

[73] *Id*. at 2462 (statement of Delegate Stevens).  He later said his "objection to this provision [i.e., the 300,000 vote provision] and the reason for this amendment is simply to make it more difficult to amend the constitution than to pass an ordinary statute."  *Id*. at 3199.  This was a real concern because, as he noted, the Constitution at that time only required signatures equal to 8 percent of the votes for Governor from the most recent general gubernatorial election in order to propose legislation by initiative petition.  *Id*. at 2462.

[74] A similar argument was made in 1913, when the Legislature was considering an amendment that would relax the restrictions on voter-initiated amendments.  See 1913 House Journal 698 ("It may be true that [requiring signatures from 20 percent of the electors] is too high a percentage.  However, the Constitution is the bulwark and foundation of our laws, and constitutional amendments have broader significance than statutory amendments," and accordingly some figure higher than 8 percent was appropriate.) (statement of Representative Charles McBride).

[75] There are, of course, other provisions in the text, such as the 100-word summary requirement, that are not germane to resolving the present case.  See Const 1963, art 12, § 2 ("The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption.").

## 3.  ARTICLE 12, §§ 2 AND 3: THE NEW-CONSTITUTION TEST

The relevant substantive limitation on the scope of voter-initiated amendments arises from the text of Article 12, § 2 when read together with Article 12, § 3.  By adopting these two different procedures for altering the Constitution, the framers intended that the mechanisms must be different in some regard.  As one treatise similarly observed in 1910:

> It may be argued . . . that if a constitution specifically provides two methods of alteration, the language employed with reference to the proposal of amendments by the legislative method may, when read with that concerning the convention method, often be construed as an implied prohibition of complete constitutional revision by the legislative method.[76]

In other words, the distinction between changes proposed by amendments and changes proposed by a convention indicates a substantive difference that limits the breadth of amendments.

Our Constitution tells us what this basic difference is.  The result of a constitutional convention called to consider a "general revision" is a "proposed

---

[76] Dodd, *The Revision and Amendment of State Constitutions* (Baltimore: Johns Hopkins Press, 1910), p 261.  The treatise was written at time when popularly initiated constitutional amendments, such as the petition initiative here, were just coming into use and legislatively initiated amendments were more common; but in either case the comparison is between an amendment and a revision.  See generally Goebel, *A Government by the People: Direct Democracy in America, 1890–1940* (Chapel Hill: University of North Carolina Press, 2002), pp 27-29 (noting that legislatures originated many constitutional amendment proposals in the nineteenth century, and that the mechanism for popularly initiated amendments began only in the last decade of that century); Jameson, A Treatise on Constitutional Conventions; Their History, Powers, and Modes of Proceeding (1887), § 544, pp 568-569 (writing near the end of the nineteenth century and noting that, with few exceptions, constitutional change came only after the legislature either called a convention or proposed an amendment).

constitution or amendments" adopted by the convention and proposed to the electors.[77]

The convention, then, can propose amendments to the existing Constitution or offer a new constitution.[78]  By contrast, if approved, a voter-initiated amendment under Article 12, § 2 "shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution . . . ."[79]  Consequently, an amendment does not replace a constitution in full, but simply adds to or abrogates specific provisions in an existing constitution.[80]  Thus, the constitutional text distinguishes between amendments that can

---

[77] Const 1963, art 12, § 3.

[78] As members of the 1961–1962 constitutional convention recognized, a convention had unrestrained authority to offer a new constitution or narrower amendments.  One delegate noted that a convention, "if it so saw fit, could, for all intents and purposes disregard the idea of a general revision and merely confine itself to a single amendment or a few amendments and leave the basic document unchanged . . . ."  2 Official Record, Constitutional Convention 1961, p 3007 (statement of Delegate Alvin Bentley).  This was because, as another delegate observed, conventions were "sovereign, autonomous bodies."  *Id*. (statement of Delegate Donald Habermehl).  A convention's broad discretion has long been noted.  See *Direct Government*, p 9 ("[T]he convention is also used for the purpose of initiating amendments to an existing document."); *Revision and Amendment*, p 258 ("Yet of course a constitutional convention when assembled may not make a general revision but may simply propose specific amendments."); *id*. at 258 n 243 ("It lies within the discretion of a convention ordinarily as to whether its action shall be substituted (1) in the form of separate amendments, or (2) as a complete new constitution, or (3) as a new constitution but with separate provisions which may be voted upon independently.  As between the first and second plans it may be said that the second is to be preferred if the changes are so great as to make submission as separate amendments confusing . . . .").

[79] Const 1963, art 12, § 2.

[80] Cf. *Livermore*, 102 Cal at 118-119 (observing that "the significance of the term 'amendment' implies such an addition or change within the lines of the original instrument").

be made by petition and new "constitutions." Because only the convention has the power to propose a constitution, by logical implication an initiative amendment cannot do so. And since this limitation would be meaningless if it only required a new constitution to be *labeled* as an amendment, it follows that an initiative amendment cannot propose changes that are tantamount to the creation of a new constitution.[81]

The phrase "general revision" supports this dichotomy between amendments and "new" constitutions, although the phrase has engendered some confusion. The "purpose" of a convention is to consider "the question of a general revision of the constitution . . . ."[82] "General" means "dealing with all or the overall, universal aspects of the subject under consideration . . . ."[83] "Revision," in turn, is relevantly defined as

_____

[81] Cf. *Attorney General ex rel Vernor v Common Council of Detroit*, 168 Mich 249, 252; 133 NW 1090 (1912) (noting, with regard to changes to a city charter, that "a general revision of an old charter may be treated as equivalent to the framing of a new charter"). As one treatise explained, around the time we adopted our Constitution, it might be "legally proper, . . . in the absence of specific constitutional restrictions to propose to the people by the legislative process [for initiating amendments] any constitutional alteration short of a complete revision or even a complete revision." *Revision and Amendment*, p 261. The treatise noted, however, that "if a constitution specifically provides two methods of alteration, the language employed with reference to the proposal of amendments by the legislative method may, when read with that concerning the convention method, often be construed as an implied prohibition of complete constitutional revision by the legislative method." *Id*. The same basic point can be made about our initiative method of amendment. But, as the explanation above demonstrates, the text and structure of our Constitution establishes the prohibition on completely rewriting the Constitution by means of an initiative amendment.

[82] Const 1963, art 12, § 3.

[83] *The Random House Dictionary of the English Language* (1966). Other dictionaries accord with this definition. See, e.g., *Webster's Third New Int'l Dictionary* (1967) ("General" is "involving or belonging to the whole of a body . . . rather than to a limited part, group, or section," "concerned or dealing with universal rather than particular

"the act or work of revising."[84]  This is how we characterized the term in *Laing*[85] and how it was described at the 1908 convention: "What is meant by revision or to revise? Why simply to re-examine for the purpose of correction—the act of reviewing or re-examination for the purpose of correction."[86]  The "revision" is simply the process for reconsidering the constitution as a whole.  It is not, as some Court of Appeals opinions suggest,[87] a particular document or proposed change.  Thus a "revision" is not

---

aspects," "marked by broad overall character without being limited, modified, or checked by narrow precise considerations[.]").

[84] *The Random House Dictionary of the English Language* (1966).  The same basic definition appears in other dictionaries.  See *The American Heritage Dictionary of the English Language* (1969) ("Revision" is "[t]he act or procedure of revising."); *Webster's Third New Int'l Dictionary* (1967) ("Revision" is "an act of revising : re-examination or careful reading over for correction or improvement[.]"); *The Century Dictionary: An Encyclopedic Lexicon of the English Language* (1911) (defining "revision" as "[t]he act of revising; reëxamination and correction").  As with the term "amendment," discussed above, the relevant dictionary definition does not change if we considered "revision" to be a legal term of art.  See *Ballentine's Law Dictionary* (3d ed, 1969) ("Revision" means "[l]ooking over a thing . . . and reviewing it carefully for the purpose of making changes, additions, and corrections, if such be deemed advisable."); *Black's Law Dictionary* (2d ed, 1910) (not defining "revision" but defining "revise" as "[t]o review, re-examine for correction; to go over a thing for the purpose of amending, correcting, rearranging, or otherwise improving it").

[85] See *Laing*, 259 Mich at 217 ("Revision implies a re-examination of the whole law . . . .").

[86] 1 *Proceedings and Debates of the Constitutional Convention of the State of Michigan 1907-1908*, p 611 (statement of delegate Benjamin Heckert).

[87] See, e.g., *CPMC*, ___ Mich App at ___;  slip op at 15 ("Our courts long have recognized that an amendment is not the same as a general revision and have attempted to define the differences between them where the constitutional provisions themselves do not define the terms."); *Citizens*, 280 Mich App at 277 ("As we will explain, the

contradistinguished from an "amendment." Rather, as noted, the distinction between the Article 12, § 3 convention process and the Article 12, § 2 amendment process is that the former can produce a proposed constitution, while the latter is limited to proposing less sweeping changes.[88]

Having determined that the relevant substantive limitation is that a voter-initiated amendment cannot be equivalent to a new constitution, we must determine what this limitation entails. As an initial matter, the number of changes is not dispositive, as even a limited number of changes can have the effect of creating a new constitution.[89] A

---

Michigan Constitution clearly establishes separate methods for enacting an 'amendment' to, as compared to a 'general revision' of, the constitution.").

[88] This distinction is further borne out by the much different requirements for calling a convention under Article 12, § 3 and for initiating an amendment proposal under Article 12, § 2. The most significant hurdle to placing a proposed amendment on the ballot by initiative petition under Article 12, § 2 is the requirement of obtaining signatures from "registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor" at the most recent general gubernatorial election. Const 1963, art 12, § 2. If the petitioner summarizes the proposal in a statement of not more than 100 words and complies with various ministerial requirements, the initiative will appear on the ballot. *Id*. By contrast, to call a convention, voters must either persuade the Legislature to pass a bill placing on the ballot the question of whether to call a convention, or the voters must wait until the question is placed on the ballot automatically every 16 years. Const 1963, art 12, § 3. If a majority of the voters at that election agree, a convention will be held. *Id*. This, in turn, requires 148 individual elections for the delegates (determined by the number of senators and representatives in the Legislature), the drafting and approval of language at the convention, and then a subsequent vote of the electors on whatever the convention produces. *Id*. Clearly, the more cumbersome and arduous process for calling a convention reflects the fact that a convention can produce more sweeping changes than can a lone amendment proposed by initiative. See *Revision and Amendment*, p 261.

[89] Cf. *Opinion of the Justices*, 264 A2d 342, 345 (Del, 1970) ("A threshold truism is that the mere *number* of changes cannot make the difference. Legislative amendments are not

28

constitution, after all, is more than words on a page. Its most basic functions are to create the form and structure of government, define and limit the powers of government, and provide for the protection of rights and liberties.[90] These are the basic threads of a constitution, and when they are removed, replaced, or radically rewoven, the whole tapestry of the constitution may change.

Therefore, changes that significantly alter or abolish the form or structure of our government, in a manner equivalent to creating a new constitution, are not amendments

---

limited in number by [the constitution]; and a 'revision' . . . does not come into being by reason of the mere number of changes or the mere fact that the changes concern the entire Constitution."). The test we adopt today is based on the constitutional text. By contrast, the qualitative/quantitative test used by the Court of Appeals, and endorsed in an altered form by the Chief Justice's dissent, comes from a line of California caselaw that began in the nineteenth century. See *Citizens*, 280 Mich App at 299-305 (tracing California law and adopting it as consistent with our law).

[90] See *New York Times Co v Sullivan*, 376 US 254, 275; 84 S Ct 710; 11 L Ed 2d 686 (1964) (noting the view of James Madison "that the Constitution created a form of government under which 'The people, not the government, possess the absolute sovereignty.' "), quoting 4 Elliot's Debates on the Federal Constitution (1876), pp 569-570; Wood, *Creation of the American Republic 1776–1787* (Chapel Hill: University of North Carolina Press, 1969), p 600 ("A constitution for Americans, said Thomas Paine, was 'not a thing in name only; but in fact. . . . It is the body of elements to which you can refer, and quote article by article; and which contains . . . every thing that relates to the complete organization of a civil government, and the principles on which it shall act, and by which it shall be bound.' "), quoting Paine, *Rights of Man*, in 1 Foner, ed, *Complete Writings of Thomas Paine* (New York: The Citadel Press, 1945), p 278; see also Friedman, *A History of American Law* (New York: Simon & Schuster, 2005), p 74 ("A constitution is different from ordinary statute law. It has two crucial functions. First, it sets up and sets out the structure of government—its permanent shape, its organs or parts, and their rights, duties, boundaries, and limits. Second, it can list the essential rights of the citizen; this list is supposed to limit what government is allowed to do[.]").

under Article 12, § 2.[91]   Contrary to the suggestion in *Pontiac Sch Dist*,[92] it is not necessarily the impact on the operations of government that matters—like the United States Supreme Court, we decline to accept "the narrow-minded assumption" that the only purpose of our constitutional provisions "is to make the government run as efficiently as possible."[93]   Further, a change that recalibrates the relative power of the branches of government—such as limiting or taking away a specific power from one branch—is not, absent a significant effect on the structure of government, a change that is tantamount to the creation of a new constitution.[94]   Indeed, we have stated that, despite its eliminating power from the judiciary or executive branch, an amendment permitting indeterminate criminal sentences was "the people['s] exercise[] [of] a right inherent in them to adopt a constitutional amendment taking away from, or adding to, the powers of

---

[91] Cf. *Bess v Ulmer*, 985 P2d 979, 987 (Alas, 1999) ("The core determination is always the same: whether the changes are so significant as to create a need to consider the constitution as an organic whole."); *Amador Valley*, 22 Cal 3d at 223 (1978) ("However, even a relatively simple enactment may accomplish such far reaching changes in the nature of our basic governmental plan as to amount to a revision also.").

[92] See *Pontiac Sch Dist*, 262 Mich at 345.

[93] *Nat'l Labor Relations Bd v Noel Canning*, 573 US ___, ___; 134 S Ct 2550, 2597; 189 L Ed 2d 538 (2014) (Scalia, J., concurring in judgment); see also *id.* at ___; 134 S Ct at 2597-2598 (" 'Convenience and efficiency,' we have repeatedly recognized, 'are not the primary objectives' of our constitutional framework.") (citation omitted).

[94] See, e.g., *Bess*, 985 P2d at 988 (holding that a proposed amendment of a constitution that would transfer reapportionment authority from the executive branch to an independent board was a permissible amendment because "the qualitative force of this narrow change" was not great enough, even though "[r]eassigning this power [was] unquestionably a significant change in the present system").

either of the departments of government."[95]  In fact, it would be difficult to imagine many amendments that leave the proportionate powers of the branches completely unchanged.[96]

## IV.  APPLICATION

Given the above analysis, VNP's proposal will be considered a permissible amendment if it does not propose changes that significantly alter or abolish the form or structure of our government in a way that is tantamount to creating a new constitution. To answer this question, we must examine our current law on redistricting and apportionment and how VNP's proposal would change that law.

## A.  APPORTIONMENT AND REDISTRICTING

Under our first three Constitutions, the Legislature was granted authority to redistrict.[97]  But the Legislature did not always carry out this responsibility.[98]  In light of

---

[95] *People v Cook*, 147 Mich 127, 132; 110 NW 514 (1907).

[96] Plaintiffs do not contend that the Constitution requires amendments to have only a single purpose and that VNP's proposal therefore fails because it has multiple purposes. In fact, in the Court of Appeals, they disclaimed this argument.  Therefore, we decline to decide whether the Constitution requires amendments to have only a single purpose and instead leave that question for another day.

[97] See Const 1835, art 4, § 3; Const 1850, art 4, § 4; Const 1908, art 5, § 4 (as ratified).

[98] For example, around 1910, when the federal census was completed showing that the urban population was growing, "[m]embers of the legislature, the majority of whom represented rural areas and small towns, balked at carrying out the requirement that the legislature be reapportioned in 1913 and every tenth year thereafter," and consequently, no reapportionment occurred in 1923 or 1933 (although a belated senate reapportionment was adopted in 1925).  Dunbar & May, *Michigan: A History of the Wolverine State* (Grand Rapids: William B Eerdmans Publishing Co, 1995), pp 548-549.  Ten years later, when it again came time to reapportion, the Senate was not reapportioned, although the House passed legislation to reapportion. *Id*. at 549.

this history, two competing voter-initiated amendments to the then-existing Constitution were placed on the November 1952 ballot.[99] One was approved, which wrote directly into the Constitution the then-existing alignment of seats in the Senate provided for in the 1952 amendment, added 10 seats to the House, and conferred upon the Board of State Canvassers the obligation to draw up new house districts if the Legislature failed to act.[100]

Our present Constitution, as ratified by the voters in 1963, laid out a different framework for reapportionment and redistricting, although for reasons that will become clear below, it is not currently followed.[101] Under the Constitution, "the 38 members of Michigan's senate and the 110 members of the house of representatives are elected according to the district in which they reside. The Constitution sets forth the apportionment factors and rules for individual districts, which are redrawn after" the federal census is published.[102] The Constitution aligns the senate districts with counties and apportions senators based on "factors" consisting of percentages of the county's

---

[99] *Id.*

[100] See *id.*; Const 1908, art 5, §§ 2 through 4 (as amended).

[101] Concern was expressed at the convention that redistricting by the Legislature may not be the best approach. See 2 Official Record, Constitutional Convention 1961, p 2014 (noting that "[r]eliance on legislatures to reapportion themselves generally has been futile. Most authorities agree that self reapportionment poses so many problems that it is seldom voluntarily undertaken by legislatures") (statement by Delegate John Hannah); see also *id.* at 2015 ("[The committee on legislative organization] became convinced that it is totally unrealistic to expect a legislature to redistrict and reapportion seats in its own body. Redistricting inevitably involves the possible denial of seats to members of the existing legislature . . . .").

[102] *CPMC*, ___ Mich App at ___; slip op at 5, citing Const 1963, art 4.

population and "land area" in the state.[103]  The house districts were based on counties and apportioned according to population.[104]  In other words, the apportionment was based on "weighted land area/population formulae."[105]

A key innovation of the 1963 Constitution was to create a bipartisan "commission on legislative apportionment" to draw the relevant district lines.[106]  The commission consisted of eight seats, with the major political parties each entitled to appoint four members.[107]  The Secretary of State was the commission's nonvoting secretary, required to furnish "all necessary technical services," and the Legislature was required to "appropriate funds to enable the commission to carry out its activities."[108]  The commission was required to "hold public hearings as may be provided by law."[109]  The commission had to complete its work within 180 days of the census data becoming available.[110]  Each final apportionment and districting plan adopted by the commission had to be published and would become law 60 days after publication.[111]  If the

---

[103] Const 1963, art 4, § 2.

[104] Const 1963, art 4, § 3.

[105] *In re Apportionment of State Legislature—1982*, 413 Mich at 107.

[106] Const 1963, art 4, § 6.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.*

commission could not agree on a plan, commissioners could submit plans to our Court, which was required to "determine which plan complies most accurately with the constitutional requirements" and direct that the plan be adopted.[112] The Court was also given jurisdiction over any application filed by electors within 60 days of publication of the plan.[113]

As our present Constitution was being deliberated at the 1961–1962 constitutional convention, the United States Supreme Court was also considering constitutional challenges to apportionment schemes. In 1962, that Court held that challenges to apportionment plans were justiciable, setting the stage for vast changes in this area of law.[114] Two years later, in *Reynolds v Sims*, the Court held that "the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."[115] Geographical considerations, such as apportionment based on counties, could no longer play a role in apportionment if they produced population deviations between the districts.[116] One week after *Reynolds* was decided, the United States Supreme Court peremptorily reversed a federal district court's

---

[112] *Id*.

[113] *Id*. In 1963, the Legislature passed a statute to provide for the redistricting commission. 1963 (2d Ex Sess) PA 46, MCL 4.11 *et seq*. The statute has never been repealed and remains on the books.

[114] *Baker v Carr*, 369 US 186, 237; 82 S Ct 691; 7 L Ed 2d 663 (1962).

[115] *Reynolds v Sims*, 377 US 533, 568; 84 S Ct 1362; 12 L Ed 2d 506 (1964).

[116] See *id*. at 567 ("[T]he weight of a citizen's vote cannot be made to depend on where he lives.").

earlier judgment that Michigan's apportionment rules were constitutional, which invalidated them.[117]

Days after *Reynolds* was decided, we ordered the commission to adopt a new plan for redistricting and apportionment that complied with the Supreme Court's decisions in *Reynolds* and various related cases decided the same day.[118] When the commission failed to reach an agreement, we issued an opinion directing it to adopt the so-called Austin-Kleiner Plan, as it most closely adhered to the new constitutional requirements.[119] In a concurrence, Justice SOURIS argued that the commission "was so dependent upon the continuing validity of the [now unconstitutional apportionment formula] by which the commission's duties were specified and expressly limited, that it could not survive alone."[120]

---

[117] See *Marshall v Hare*, 378 US 561; 84 S Ct 1912; 12 L Ed 2d 1036 (1964), rev'g 227 F Supp 989 (ED Mich, 1964).

[118] *In re Apportionment of State Legislature—1964*, 373 Mich 247, 248-249; 128 NW2d 721 (1964).

[119] *In re Apportionment of State Legislature—1964*, 373 Mich 250, 254; 128 NW2d 722 (1964).

[120] *Id*. at 259 (SOURIS, J., concurring); see also *id*. ("It is incomprehensible to me that the people of this State . . . would have intended to grant a commission composed of 8 members selected by the 2 major political parties in the State from 4 specifically designated areas of the State the power of apportionment and districting of the State's legislature without the very specific and rigidly limiting directions unconstitutionally and ineffectually sought to be imposed upon the commission by the [apportionment formulas].").

The apportionment issue was back before the Court in 1972 after the commission once again deadlocked and invoked our supervision.[121] We ordered the adoption of a proposed apportionment plan, but did not comment on the viability of the commission.[122] Justice T. G. KAVANAGH dissented, reaching the same conclusion Justice SOURIS had in 1964: the commission could not exist—i.e., was not severable from—the unconstitutional apportionment standards in our Constitution.[123]

In 1982, with yet another deadlocked commission seeking our supervision, we adopted the position of Justices SOURIS and T. G. KAVANAGH by declaring that the commission was not severable from the unconstitutional apportionment provisions it was directed to implement.[124] We thought the commission was inseparable from the unconstitutional standards because holding otherwise would have required us to opine on whether the people would have voted for the commission without those standards.[125] Because the issue of changing how legislators are chosen is "a fundamental matter," we would not "speculate on a matter of such enormous importance."[126] Critically, we

---

[121] See *In re Apportionment of State Legislature—1972*, 387 Mich 442; 197 NW2d 249 (1972).

[122] *Id*. at 458.

[123] *Id*. at 493 (T. G. KAVANAGH, J., dissenting).

[124] *In re Apportionment of State Legislature—1982*, 413 Mich at 116.

[125] *Id*. at 136-137.

[126] *Id*. at 137-138.

emphasized repeatedly that "[t]his is a decision which the people should make."[127] It was a decision, we suggested, that the people could initiate through a constitutional amendment:

> The power to redistrict and reapportion the Legislature remains with the people. The people, however, can only exercise that power, as a practical matter, by amending the constitution, which, unless the Legislature proposes an amendment acceptable to the people, is a difficult and time-consuming process.[128]

Tellingly, we noted in the same discussion that "[t]he initiative process is also difficult and time-consuming."[129] Because that process was slow, and a plan needed to be formulated in the meantime, we appointed an individual to oversee the drawing of a redistricting and apportionment plan consistent with various principles we established.[130] We noted, however, that the Legislature could draw its own plan, which would supersede the one we set in motion.[131] But again, we stressed that our plan was merely a stopgap that would "stand until the people act, or it is changed by the collective action of the other two branches of this government, composed of persons who are the most immediate representatives of the people."[132] It was not until 1996 that the Legislature codified

---

[127] *Id*. at 138; see also *id*. ("The matter should be returned to the political process in a manner which highlights rather than hides the choices the people should make.").

[128] *Id*. at 139-140.

[129] *Id*. at 140 n 25.

[130] *Id*. at 140-142.

[131] *Id*. at 142-143.

[132] *Id*. at 140.

apportionment standards and committed itself to drawing districts in the future.[133]

Thus, the last time the voters had direct input on this issue, they opted for apportionment and redistricting to be conducted by a commission. The rules to be implemented by that commission have been declared unconstitutional, and we deactivated the commission by concluding that it was not severable from those unconstitutional rules. The Legislature now exercises a power that the Constitution of 1963 expressly denied to it—to draw legislative districts—because our Constitution has never been amended to modify the unconstitutional provisions concerning apportionment and redistricting.

## B. THE VNP PROPOSAL

That is precisely what VNP's constitutional amendment proposes to do. To accomplish this task, the proposal would eliminate the current language in the Constitution laying out the apportionment formulae.[134] Instead, seven criteria are proposed, requiring that the districts must, in order of priority: (1) have "equal population as mandated by the United States Constitution," (2) "be geographically contiguous," (3) "reflect the state's diverse population and communities of interest," (4) "not provide a disproportionate advantage to any political party," measured by "accepted measures of partisan fairness," (5) "not favor or disfavor an incumbent elected official," (6) "reflect

---

[133] See 1996 PA 463 (state legislative districts); 1999 PA 221 (federal congressional districts).

[134] VNP proposal, art 4, §§ 2 through 3.

38

consideration of county, city, and township boundaries," and (7) "be reasonably compact."[135]

Rather than rewriting the constitutional section governing the commission, the VNP proposal simply deletes the language in Const 1963, art 4, § 6 establishing the commission.[136] In its place, the proposal offers a reformed commission that is similar to its predecessor.[137] Like the old one, it consists of four members from each major political party, but it would have five additional members who are declared independent voters.[138] All 13 members would be selected from a pool of candidates who have submitted applications, taken oaths, and met various other requirements.[139] The leaders of both parties in the Senate and House can strike, in total, 20 names from the applicant pools.[140] The commission, once selected, must hold public hearings and its contact with the public is regulated in detail by the proposal.[141] A plan is adopted only with at least two votes

---

[135] VNP proposal, art 4, § 13. Although the proposed language is presented capitalized, this opinion presents it in standard type throughout for ease of reading.

[136] VNP proposal, art 4, § 6.

[137] VNP proposal, art 4, § 6(2)

[138] *Id.*

[139] *Id.*

[140] VNP proposal, art 4, § 6(2)(E).

[141] VNP proposal, art 4, §§ 6(8) through (11).

from each subgroup (Republicans, Democrats, and independents), as well as a majority of the whole.[142]

The proposal continues nearly verbatim various ancillary provisions from the 1963 commission. The Secretary of State, for example, remains a nonvoting secretary of the commission, charged with providing the commission "all technical services that the commission deems necessary."[143] Likewise, the Legislature remains obligated to "appropriate funds" for the commission, although the proposal provides a detailed breakdown of what the funds go to, whereas the 1963 Constitution simply required the appropriation of sufficient funds "to enable the commission to carry out its activities."[144] Our Court has a similar, if perhaps narrower, jurisdictional grant under the proposal: we can "direct the Secretary of State or the commission to perform their respective duties," and we may also "review a challenge to any plan adopted by the commission" and "shall remand a plan to the commission for further action if the plan fails to comply with the requirements of this Constitution, the Constitution of the United States or superseding federal law."[145] The proposal adds various provisions clarifying that the commission's

---

[142] VNP proposal, art 4, § 6(14).

[143] VNP proposal, art 4, § 6(4); see Const 1963, art 4, § 6 ("all necessary technical services").

[144] VNP proposal, art 4, § 6(5); Const 1963, art 4, § 6.

[145] VNP proposal, art 4, § 6(19). By statute, we presently have "original and exclusive state jurisdiction to hear and decide all cases or controversies in . . . involving a redistricting plan" drawn under the current scheme. MCL 4.262.

power is legislative and not subject to the Legislature's[146] or the Governor's[147] control, and the vesting clauses of the judicial, executive, and legislative branches are amended so as to vest power in their respective branches "except to the extent limited or abrogated" by certain of the new provisions.[148]

## C. ASSESSING THE PROPOSAL

To determine whether VNP's proposal is a permissible amendment, we must ask whether it significantly alters or abolishes the form or structure of our government in a manner that is tantamount to creating a new constitution.[149]

---

[146] VNP proposal, art 6, § 6(22).

[147] VNP proposal, art 5, § 2.

[148] VNP proposal, art 4, § 1; VNP proposal, art 5, § 1; VNP proposal, art 6, § 1.

[149] The baseline for measuring these changes includes more than just the current procedure, but also, and perhaps even more importantly, the provisions in the 1963 Constitution that are no longer effective. It is, after all, the Constitution that would be amended by VNP's proposal, not the current statutory scheme that has filled the gap created by our decision holding that the present constitutional provisions are unconstitutional. See *In re Apportionment of State Legislature—1982*, 413 Mich at 115-116. Despite our ruling, we have no power to make the law disappear. Cf. *Steffel v Thompson*, 415 US 452, 469; 94 S Ct 1209; 39 L Ed 2d 505 (1974) (" 'Of course, a favorable declaratory judgment may nevertheless be valuable to the plaintiff though it cannot make even an unconstitutional statute disappear.' ") (citation omitted); *Winsness v Yocom*, 433 F3d 727, 728 (CA 10, 2006) ("There is no procedure in American law for courts or other agencies of government—other than the legislature itself—to purge from the statute books, laws that conflict with the Constitution as interpreted by the courts."); *Pidgeon v Turner*, 538 SW3d 73, 88 n 21 (Tex, 2017) ("When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it."); see generally Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va L Rev (forthcoming 2018), pp 4-5 ("[T]he statute continues to exist, even after a court opines that it violates the Constitution, and it remains a law until it is repealed . . . ."). Indeed, that is why VNP's proposal strikes out

One central feature of the VNP amendment is that it sweeps away unconstitutional provisions that have remained in the Constitution for some time. The "weighted land area/population formulae" and the accompanying apportionment factors[150] are gone, and so counties would not be the organizing feature of redistricting plans. But these changes involve no great transformation because these features were held unconstitutional 36 years ago. In their place our state has used federal constitutional requirements and

_____

various provisions long held unconstitutional. This is not to say that those provisions could now constitutionally be enforced; rather, they simply remain relevant in determining the degree of change wrought by VNP's proposal. In this regard, it is also noteworthy that the statutory framework created in 1963 to effectuate the redistricting commission has never been repealed. See MCL 4.11 to 4.20. In other words, current statutes appear to require that the commission convene and submit redistricting plans.

The Chief Justice's dissent appears to suggest that judges have the power not just to declare a legal provision to be unconstitutional (i.e., to say what the law is), but rather to actually amend the Constitution by deleting from it any text the judge declares to be unconstitutional. His dissent, then, seems to suggest that a court can physically remove written text of statutes and constitutions. But that is simply not how a judgment of even the highest court in the land works. Cf. Mitchell, *Textualism and the Fourteenth Amendment*, 69 Stan L Rev 1237, 1298 (2017) ("Judicial review means only that the Court may decline to enforce a federal statute in a particular case—if (and only if) the Court concludes that enforcing the statute would conflict with its paramount duty to obey the Constitution. But federal statutes that the Supreme Court has declared 'unconstitutional' remain laws until Congress repeals them, and the Court must enforce those laws when it can do so consistent with the Constitution.") (citations omitted). Tellingly, the Chief Justice's dissent cites several abrogated federal constitutional provisions, but these are easily distinguished given that the people have chosen to affirmatively abrogate them by ratifying superseding amendments. That is not the case here. Our decision declaring that the commission could not be severed from unconstitutional standards was not a superseding constitutional amendment, but rather a judicial remedy to cure a conflict between our state Constitution and the United States Constitution.

[150] *In re Apportionment of State Legislature—1982*, 413 Mich at 107.

various state "guidelines,"[151] enacted in 1996, including that the districts "[be] areas of convenient territory contiguous by land,"[152] "preserve county lines with the least cost to the principle of equality of population,"[153] and remain as compact as possible when drawn within a city or township with multiple districts.[154] VNP's proposed standards reflect many of the same principles, including, of course, adhering to federal law, and also requiring contiguous districts, respecting municipal boundaries, and seeking reasonable compactness.[155] The proposal contains a few new items too, such as considerations of partisan fairness. But given their continuities with the current standards, VNP's proposed standards are no revolution in redistricting, and they certainly do not portend a transformation of our form or structure of government.

As noted above, various provisions in VNP's proposal mirror those in the current Constitution. The Secretary of State has substantially the same general responsibilities, being the nonvoting secretary of the commission responsible for furnishing its needs.[156] The Secretary of State has more detailed obligations under the proposal, involving the

---

[151] MCL 4.261; MCL 3.63.

[152] MCL 4.261(c); MCL 3.63(c)(*i*).

[153] MCL 4.261(e); see also MCL 3.63(c)(*ii*) ("Congressional district lines shall break as few county boundaries as is reasonably possible.").

[154] MCL 4.261(i); MCL 3.63(c)(*vi*).

[155] VNP proposal, art 4, § 13.

[156] Compare Const 1963, art 4, § 6, with VNP proposal, art 4, § 6(4).

formation of the commission.[157]   But these tasks are ministerial and in line with our current Constitution—requiring the Secretary of State to manage applications or other records is business as usual, not a new way of governing Michigan.[158]

Since plaintiffs and the Chief Justice's dissent concede that "the people can alter the power of redistricting by amending the Constitution,"[159] the more significant argument against the VNP proposal is that it disrupts the separation of powers.   The powers are most glaringly reconfigured, according to plaintiffs, by the proposal's inclusion of limiting language in the vesting clauses of each branch.   The legislative, executive, and judicial branches are given their respective powers "except to the extent limited or abrogated" by certain parts of the proposal.[160]   The dissent takes the position that these changes "fundamentally change the operation of our government" by limiting the vested powers of the branches and creating a new commission with responsibility for redistricting.[161]   We disagree.

---

[157] VNP proposal, art 4, § 6(2) (requiring the Secretary of State to make applications available and accept completed applications, require oaths to be taken, remove incomplete or inadequate applications, and randomly select applicants).

[158] See, e.g., MCL 324.80320(3) ("Receipt by the secretary of state of a properly tendered application for a certificate of title on which a security interest in a watercraft is to be indicated is a condition of perfection of a security interest in the watercraft . . . ."); MCL 257.248(1) (requiring the Secretary of State to "conduct [an] investigation within 15 days after receiving the application" for a dealer license).

[159] *Post* at 23 n 12.

[160] VNP proposal, art 4, § 1; VNP proposal, art 5, § 1; VNP proposal, art 6, § 1.

[161] *Post* at 37.

The limitations in the vesting clauses are, in many ways, the result of VNP's attempt to comply with other requirements in Article 12, § 2. By including this language, the proposal simply seeks to harmonize its changes with the rest of the Constitution. This is important because Article 12, § 2 requires that the proposal republish for the voters any portion of the present Constitution that the proposed amendments would alter or abrogate.[162] This requirement has kept at least one proposal off the ballot in the recent past.[163] By explicitly adding limitations to the vesting clauses here, VNP sought to avoid any argument that it was implicitly altering or abrogating the vesting clauses or other parts of the Constitution. More broadly, by adding this language, the proposal makes explicit what would have been implicit without the language—the proposal does have some effect on the responsibilities and powers of the branches of government. But the proposed language in the vesting clauses tells us nothing useful to the critical inquiry: just how significant are the changes? The proposal is in jeopardy only if the changes are equivalent to the creation of a new constitution. To answer that question, we have to examine the proposed changes that affect the branches' relative powers.

To begin, consider how the proposal would change the present Constitution with regard to the Legislature. The present Constitution does not accord the Legislature any role in the redistricting or apportionment process. Instead, like VNP's proposal, a

---

[162] Const 1963, art 12, § 2.

[163] See *Protect Our Jobs*, 492 Mich at 773-774 (holding that one of the proposed amendments altered or abrogated an existing constitutional provision, triggering the republication requirement).

45

commission is placed in charge. The commissions are materially similar. Both are charged with drawing a redistricting plan based on various guidelines. And while the guidelines have changed, as explained above, VNP's proposal actually reflects many of the same standards currently used. The major difference between the 1963 Constitution's commission and VNP's is the process by which commission members are chosen. VNP's proposal is undoubtedly more elaborate on this point. Nonetheless, as with the old commission, VNP's proposal seeks to ensure that the membership strikes a partisan balance. In fact, in doing so, VNP's proposal gives the Legislature a formal role in the process, with the majority and minority leaders of each house entitled to a certain number of vetoes on members.[164] The Legislature has no such role in the 1963 Constitution's commission. If anything, then, VNP's proposal increases, slightly, the Legislature's participation in the process over the level contemplated in 1963. And the Legislature's new, minor role does not come at the expense of either of the other two branches, which have no real part in this process.

Of course, we are not oblivious to the fact that the Legislature, since 1996, has established the standards and framework for redistricting, as well as drafted the plans.[165] But the current state of affairs is a deviation from what the voters chose when they ratified the 1963 Constitution.[166] Under the 1963 Constitution, the power to draw

---

[164] VNP proposal, art 4, § 6(2)(E).

[165] See, e.g., MCL 4.801 (current plan for Senate districts); MCL 4.802 (current plan for House districts).

[166] The Chief Justice's dissent also invites us to apply the repudiated concept of legislative acquiescence to the people's failure to amend the Constitution after our

districts never belonged to the Legislature. Rather, its present role is solely due to a judicial remedy we crafted in light of our conclusion that the unconstitutional apportionment standards the commission was directed to implement could not be severed from the commission itself.[167] Nothing about the commission was intrinsically unconstitutional. Thus, to the extent that the Legislature's power is being diminished, that power had not been granted by the people through the Constitution. If anything, VNP's proposal is an attempt to correct the constitutional deficiencies so that the basic design of the 1963 Constitution—which created an independent redistricting

---

decision in 1982 rendering the redistricting commission ineffective. The theory of legislative acquiescence is that the Legislature, by failing to correct a judicial decision, has acquiesced in that decision. See generally *McCahan v Brennan*, 492 Mich 730, 749-750; 822 NW2d 747 (2012). The Chief Justice's dissent suggests this basic theory should be imported here, based on "the entirety of the 'indirect input' in representative self-government in which the people have been engaged during the ensuing 55 years . . . ." *Post* at 24 n 14. That is simply another way of saying that our analysis should credit the people's *inaction*—that they have somehow acquiesced in our 1982 decision. But we have rightly rejected theories of interpretation relying on acquiescence by nonaction. See *McCahan*, 492 Mich at 749-750 ("First and foremost, legislative acquiescence has been repeatedly repudiated by this Court because it is . . . an exceptionally poor indicator of legislative intent. When used in a case like this, the theory requires a court to intuit legislative intent not by anything that the Legislature actually enacts, but by the *absence* of action. Yet 'a legislature legislates by legislating, not by doing nothing, not by keeping silent.' Thus, the doctrine of legislative acquiescence 'is a highly disfavored doctrine of statutory construction; sound principles of statutory construction require that Michigan courts determine the Legislature's intent from its *words*, not from its silence.' ") (citations omitted); see also Markman, *On Interpretation*, at 226 n 60 ("[N]o sensible theory of statutory interpretation would require Congress to devote a substantial portion of its time to extinguishing judicial forest fires."). Given that it is much more difficult for the people to directly act on this topic—i.e., amend the Constitution—their failure to act sheds even less light on the matter.

[167] See *In re Apportionment of State Legislature—1982*, 413 Mich at 116.

47

commission—can be implemented. We cannot reasonably conclude that this effort to revivify and improve upon a feature of the present Constitution amounts to a substantial alteration in the form or structure of our government.[168]

The executive branch is not significantly affected by the proposal. Under the 1963 Constitution, the executive played no role in redistricting except for the Secretary of State's various responsibilities. Those would expand under VNP's proposal, as noted above, but not in any material respect. VNP's proposal neither adds to nor subtracts from any other responsibilities or powers of the executive branch compared to its position under the present Constitution. Any additional powers the executive might currently have—such as a veto over the Legislature's statutorily drawn redistricting—do not flow from a constitutional grant of power, but instead from the provisional situation that has been created by declaring the 1963 commission to be inseverable from the unconstitutional apportionment standards.

Finally, VNP's proposal only modestly changes the judicial branch's role in the redistricting process. The 1963 Constitution has provided this Court with jurisdiction when the commission reached an impasse, which it often did.[169] In such cases, the

---

[168] Cf. *Laing*, 259 Mich at 217 ("Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose."); *Opinion of the Justices*, 264 A2d at 346 ("A constitutional 'amendment' was defined . . . as 'such an addition or change *within the lines of the original instrument* as will effect an improvement or better carry out the purpose for which it was framed.'") (emphasis added), quoting *Livermore*, 102 Cal at 118-119; see also *Bess*, 985 P2d at 985 (quoting the same language from *Livermore*).

[169] Const 1963, art 4, § 6.

commission members could submit proposed plans to this Court, and we would have to select the one that best reflected constitutional requirements.[170] Additionally, the Constitution provided us original jurisdiction over applications by electors after the commission published a plan—we could then direct the Secretary of State and the commission to "perform their duties," review the commission's proposed plan, and remand the plan to the commission "if it fails to comply with the requirements of *this* constitution."[171] Thus, the Constitution offered this Court a limited array of options to review redistricting plans. VNP's proposal does likewise. In some ways, in fact, the review is slightly broader. When the original commission failed to reach agreement under the current Constitution, this Court was empowered only to select between the plans proposed by the commission members. Under VNP's proposal, we can review any challenge to a plan for compliance not only with this Constitution, but also the United States Constitution and "superseding federal law."[172] Thus, the Court would no longer have the option to choose a plan—from those presented—but it would maintain the same general powers it wielded under the 1963 Constitution as ratified.[173]

---

[170] *Id*.

[171] *Id*. (emphasis added).

[172] VNP proposal, art 4, § 6(19).

[173] Under the present state of affairs, the Legislature has reconfirmed our "original state jurisdiction provided under section 6 of article IV of the state constitution of 1963 . . . ." MCL 4.262(3). While the statute provides a few other powers that we would lack under VNP's proposal, it must be repeated that the present system of redistricting is merely a stopgap designed to address the fact that the relevant constitutional provisions are not currently in effect. As a result, the system does not flow explicitly from the Constitution.

In sum, VNP's proposal leaves the form and structure of the government essentially as it was envisioned in the 1963 Constitution. Consequently, it is not equivalent to a new constitution and is therefore a permissible amendment under Const 1963, art 12, § 2.[174]

This conclusion finds support from a host of other considerations. It is consistent with the expectations of key members of the 1961–1962 constitutional convention, as evidenced by their discussion of the signature requirement in Article 12, § 2. During that discussion, which centered on whether to add an alternative requiring only 300,000 signatures,[175] some delegates expressed the belief that a voter-initiated amendment could be used to change the apportionment system, which was a noted problem at the convention. One delegate—referring to the United States Supreme Court's then-recent decision in *Baker v Carr*, which opened the door to constitutional challenges to redistricting[176]—thought that the initiative could be "a remedy to the problem of

---

[174] Indeed, for this reason, this proposal should be construed as an "amendment" even under the standard set forth in the Chief Justice's dissent. The dissent argues that the essential inquiry is whether the VNP proposal "fundamentally change[s] the operation of our government," *post* at 37, but as we have shown, no fundamental change is being wrought relative to what the voters themselves approved in 1963. The dissent gets around this by arguing that popular acquiescence in the provisional arrangement this Court put in place in 1982 amounts to a de facto amendment of the Constitution, but as noted earlier in this opinion, this Court has rejected acquiescence as a technique of interpreting legislative texts.

[175] See pages 22 through 23 of this opinion.

[176] *Baker*, 369 US at 237.

reapportionment."[177]  Delegate Stevens, one of the leading proponents of keeping the amendment process difficult, agreed, opining that "the initiative could be used for amending the constitution to make apportionment . . . or changing the apportionment easier."[178]

Similarly, when declaring the redistricting commission not viable in 1982, this Court suggested that our apportionment system could be addressed through an amendment to the Constitution initiated by the people.[179]  Our statement, quoted above, bears repeating: "*The power to redistrict and reapportion the Legislature remains with the people*."[180]  It was only because the amendment process—whether initiated by the Legislature or the people—was time-consuming that we invited the Legislature to fill the void.[181]  As Justice LEVIN later explained, our approach in 1982 was based, in part, on the "assumption . . . that responsible persons would come forth and place on the ballot, and the people would adopt, new apportionment rules in time for the 1992 and 1994 elections.

---

[177] 2 Official Record, Constitutional Convention 1961, p 2463 ("[I]t seemed to me that one of the important things for Michigan to pass muster is to be sure that the people have a remedy to the problem of reapportionment, and that ease of amending the constitution would be an important remedy.") (statement of Delegate Dorothy Judd).

[178] *Id*. (statement of Delegate Stevens).

[179] *In re Apportionment of State Legislature—1982*, 413 Mich at 139-140.  As another court similarly noted, "The makeup and apportionment of the Legislature . . . . are [questions] far better entrusted to the collective political wisdom of the Legislature *subject to* the power of initiative and referendum reserved to the people."  *Silver v Brown*, 63 Cal 2d 270, 280; 405 P2d 132 (1965)  (emphasis added).

[180] *In re Apportionment of State Legislature—1982*, 413 Mich at 139 (emphasis added).

[181] *Id*. at 140.

Indeed, that was one of the arguments for non-severability—to highlight the need for a new constitutional provision regarding legislative apportionment."[182] "The Court's exhortation," he added, "has not been heeded."[183]

The history of our constitutional amendments, too, supports treating VNP's proposal as a proper voter-initiated amendment.[184] Most directly, the voters have in the past proposed a number of amendments dealing with apportionment,[185] including one successful amendment that, in certain circumstances, expressly stripped the Legislature of the power to redistrict. In 1952, voters initiated two competing constitutional amendments addressing apportionment.[186] The successful amendment "guaranteed the decennial reapportionment of the house of representatives substantially on a population basis, and fixed senate districts permanently in the constitution . . . ."[187] The Legislature

---

[182] *In re Apportionment of State Legislature*, 437 Mich 1208, 1211 (1990) (statement of LEVIN, J.).

[183] *Id.*

[184] See Young, Jr., *A Judicial Traditionalist Confronts Unique Questions of State Constitutional Law Adjudication*, 76 Alb L Rev 1947, 1949 (2013) (noting that if doubt remains as to the meaning of a constitutional provision, courts can use "anything else that might provide an historical context").

[185] Indeed, earlier initiatives dealing with apportionment were placed on the ballot in 1924, 1928, and 1930. See Pollock, *The Initiative and Referendum in Michigan* (Ann Arbor: University of Michigan Press, 1940), pp 81-82.

[186] *Michigan: A History*, pp 548-549.

[187] Lamb, Pierce & White, *Apportionment and Representative Institutions: The Michigan Experience* (Washington, DC: Institute for Social Science Research, 1963), p 130; see also Const 1908, art 5, §§ 2 through 4 (as amended).

was responsible for reapportioning the house, but, critically, if it failed to do so "in accordance with the mandate of this [constitutional] article, the board of state canvassers" was required to reapportion the districts.[188] In other words, the voters initiated an amendment that, in certain cases, eliminated the Legislature's reapportionment power and gave it to an agency in the executive branch. By comparison, VNP's proposal is more modest—the present Constitution prescribes a commission for these purposes, and VNP's amendment would retain that commission. The voters have also approved, in the past, various amendments creating commissions or affecting the powers of government at various levels and branches.[189]

Other states have created independent redistricting commissions through voter-initiated amendments, including Arizona and California.[190] And the issue of whether to

---

[188] Const 1908, art 5, § 4 (as amended).

[189] For example, in 1940, the people voted to amend Const 1908, art 6, to create the Civil Service Commission, which manages employment for all three branches of government. See Const 1908, art 6, § 22; Const 1963, art 11, § 5. In 1968, the people successfully amended article 6 of our Constitution to create the Judicial Tenure Commission, a body tasked with investigating instances of judicial misconduct throughout the state. See Const 1963, art 6, § 30. The people enacted the Headlee Amendment in 1978, significantly limiting the taxing powers of state and local government. See Const 1963, art 9, §§ 6, 25 through 34. Term limits for members of the Legislature, as well as the Governor, Attorney General, and Secretary of State, were established by initiative in 1992. See Const 1963, art 4, § 54; Const 1963, art 5, § 30.

[190] See *Arizona State Legislature v Arizona Independent Redistricting Comm*, 576 US ___, ___; 135 S Ct 2652, 2662; 192 L Ed 2d 704 (2015) ("Some States, in common with Arizona, have given nonpartisan or bipartisan commissions binding authority over redistricting. The California Redistricting Commission, established by popular initiative, develops redistricting plans which become effective if approved by public referendum.").

create such a commission has appeared on the ballot, by virtue of the initiative process, numerous times in multiple states.[191]  Similarly, citizens in several states have employed initiatives to accomplish redistricting.[192]

Our conclusion today is also reinforced by the reasoning in *Bess v Ulmer*, which addressed a similar argument concerning a similar ballot proposal.[193]  In *Bess*, a "Legislative Resolve" placed a proposed amendment before the voters that would remove the reapportionment power from the executive branch (where the state's constitution had placed it) and transfer it to a "neutral body."[194]  Using a test similar to what the Court of Appeals employed in this case—focusing on the quantity and quality of the proposed changes and whether the changes were few, simple, and of less importance—the Alaska Supreme Court determined that the proposal was an amendment:

---

[191]  Stephanopoulos, *Reforming Redistricting: Why Popular Initiatives to Establish Redistricting Commissions Succeed or Fail*, 23 J L & Pol 331, 343-377 (2007) (discussing in detail 12 times when the question of creating a redistricting commission was voted on as a result of voter-initiated amendments).

[192]  See Miller, *Direct Democracy and the Courts* (New York: Cambridge University Press, 2009), p 151 ("In several initiative states, citizen lawmakers participated in legislative redistricting.  For example, in Arizona (1918, 1932), California (1926), Colorado (1932, 1962), Oregon (1952), and Washington (1956), citizens used the initiative power either to determine district lines or to establish new criteria for the legislature to follow when drawing districts."); *id*. at 152 n 122 (noting that "[c]itizen lawmakers in two other states, Arkansas (1936) and Michigan (1952), also accomplished redistricting through the initiative process").

[193]  *Bess*, 985 P2d at 981.

[194]  *Id*. at 988.

Reassigning this power is unquestionably a significant change in the present system of Alaskan government. It does not, however, deprive the executive branch of a "foundational power," and as a result does not constitute a revision. As the quantitative effect of the proposal is minimal, the qualitative force of this narrow change would have to be greater to satisfy our hybrid test. The essential function of the executive branch—to enforce the laws of the state—remains unchanged, as does its structure. No executive power is delegated to either of the other two branches. In fact, the intent of the Framers in giving the reapportionment power to the executive was primarily to prevent the abuse or neglect of that power in the hands of the legislature, rather than to safeguard a uniquely executive function.[195]

In our case, the framers of the 1963 Constitution did not assign the apportionment power to any elected body, and so the effect of the changes here would be even less significant than that in *Bess*.[196]

Thus, our holding here reflects the constitutional text, our historical experience, logic, and the wisdom of other states. For all the above reasons, then, we conclude that VNP's proposal does not create the equivalent of a new constitution by significantly altering or abolishing the form or structure of our government and is, instead, a permissible voter-initiated amendment.[197]

---

[195] *Id*. (citations omitted).

[196] Though *Bess* used a qualitative/quantitative test, its underlying reasoning regarding the effect of the amendment on the balance of powers is useful under the standard we adopt today.

[197] CPMC also argues, and Justice WILDER agrees in his separate dissent, that the VNP proposal cannot be put on the ballot because the proposal failed to republish "existing provisions of the constitution which would be altered or abrogated thereby . . . ." Const 1963, art 12, § 2. In particular, Justice WILDER concludes that the VNP proposal abrogates the Oath Clause, Const 1963, art 11, § 1, which states that, excepting the oath that officers will "faithfully discharge the duties" of their offices, "[n]o other oath, affirmation, or any religious test shall be required as a qualification for any office or

V. CONCLUSION

The question we face today has broad significance for the people of this state: what limitations have they placed, in the Constitution they ratified, on their power to put forward voter-initiated amendments? This question implicates some of the oldest and

---

public trust." The VNP proposal requires applicants to "attest under oath that they meet the *qualifications* set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the Legislature . . . and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties." VNP Proposal, art 4, § 6(2)(A)(III) (emphasis added). Because of this abrogation, according to Justice WILDER's dissent, VNP was required to republish Const 1963, art 11, § 1, and because it did not, the proposal must be kept off the ballot.

We do not agree that the VNP proposal amounts to an abrogation under Const 1963, art 12, § 2 by requiring an oath that is prohibited under Const 1963, art 11, § 1. As VNP noted in its brief, our Court addressed this basic issue in *Tedrow v McNary*, 270 Mich 332; 258 NW 868 (1935). In that case, the issue was whether the Oath Clause prohibited a statute that required candidates for a certain public office to file an affidavit or other evidence of their educational qualifications. We upheld the requirement, observing that the Legislature could prescribe qualifications for office and that requiring proof of those qualifications, including in the form of an affidavit, "in no way conflicts with the constitutional provision." *Id*. at 335. See also *Attorney General v Macdonald*, 164 Mich 590, 593; 129 NW 1056 (1911) (holding that a residency requirement "is not 'a test,' as that word is used in the Constitution, but is rather a special qualification"). This reasoning is why, for example, *all* judicial candidates are statutorily required to complete an "affidavit . . . stating that he or she possesses the constitutional qualifications set forth in section 19 of article VI of the state constitution." MCL 168.544b. Otherwise, it would be impossible to require judicial candidates to confirm that they meet the constitutional qualifications for office. And it is also why *all* candidates for elective office in Michigan (except those running for president or vice president of the United States) are required to file an affidavit of identity. MCL 168.558. Further, as Justice WILDER notes in his dissent, there is nothing improper about inquiring into a candidate's political affiliation to determine eligibility for a bipartisan commission or board. Therefore, because the VNP proposal simply requires candidates to attest to their qualifications for a position on the commission—a requirement *Tedrow* allows—the proposal in no way "renders [the Oath Clause] wholly inoperative." *Protect Our Jobs*, 492 Mich at 773; see also *Massey v Secretary of State*, 457 Mich 410, 418; 579 NW2d 862 (1998); *Ferency*, 409 Mich at 597.

56

most perplexing problems in political theory, such as the nature of sovereignty, republicanism, and democracy. But it is not a judge's role to philosophize a theory of government. Rather, we are stewards of the people and must faithfully abide by the decisions they make through the laws they adopt. We accomplish this by adhering to the plain meaning of the text of those laws. Here, that approach leads us to conclude that a voter-initiated amendment under Const 1963, art 12, § 2 is permissible if it does not significantly alter or abolish the form or structure of our government, making it tantamount to creating a new constitution. VNP's proposal surpasses these hurdles and is a permissible voter-initiated amendment under Article 12, § 2. Accordingly, the judgment of the Court of Appeals is affirmed. Pursuant to MCR 7.315(C)(3), the Clerk of the Court is directed to issue the judgment forthwith.

David F. Viviano
Bridget M. McCormack
Richard H. Bernstein
Elizabeth T. Clement

57

STATE OF MICHIGAN

SUPREME COURT

CITIZENS PROTECTING MICHIGAN'S
CONSTITUTION, JOSEPH SPYKE, and
JEANNE DAUNT,

       Plaintiffs-Appellants,

v

No. 157925

SECRETARY OF STATE and
BOARD OF STATE CANVASSERS,

       Defendants/Cross-Defendants-
       Appellees,

and

VOTERS NOT POLITICIANS BALLOT
COMMITTEE, d/b/a VOTERS NOT
POLITICIANS; COUNT MI VOTE, d/b/a
VOTERS NOT POLITICIANS; KATHRYN
A. FAHEY; WILLIAM R. BOBIER; and
DAVIA C. DOWNEY,

       Intervening Defendants/Cross-
       Plaintiffs-Appellees.

_____

MARKMAN, C.J. (*dissenting*).

I respectfully dissent from the majority's affirmance of the judgment of the Court

of Appeals. The majority concludes that the proposal at issue, i.e., the Voters Not

Politicians (VNP) proposal, is eligible for placement on the November 2018 election

ballot by the *initiative* process of Const 1963, art 12, § 2. I dissent because I conclude

that the proposal constitutes a "general revision" of the Constitution and thus is eligible for placement on the ballot only by the *convention* process of Const 1963, art 12, § 3.

## I. INTRODUCTION

This case, I would emphasize, does not concern whether the VNP proposal is wise or unwise, prudent or imprudent. Nor does it concern whether the people of this state possess the ultimate authority to restructure the government of this state, for they indisputably do. Rather, it concerns only whether the VNP proposal is better understood as a constitutional "amendment," and thus eligible for placement on the ballot by the initiative process, or a "general revision" of the Constitution, and thus eligible for placement on the ballot only by the convention process.

The "people" have been referenced frequently during oral argument and by the majority opinion, as if merely to invoke their name compels the conclusion that the present measure must be placed on the ballot. However, the "people" wear many hats. The "people" invoke the initiative process, or at least 315,654 "people" do so; the "people" vote on the initiative process; "[w]e, the people" have ordained and established our Constitution, Const 1963, preamble; all political power is inherent in the "people," Const 1963, art 1, § 1; government is instituted for the equal benefit, security, and protection of the "people," *id*.; laws and ordinances issued under the Constitution define the rights and responsibilities of the "people"; and, of course, 13 "people," all randomly selected, are to sit on the commission established by the VNP proposal. After assessing the interests of the "people" in this matter, I believe that what is most significant is that these "people" have made it reasonably clear that the permanent things of *their*

2

Constitution are not to be cast away lightly-- that while ultimately the "people" do possess the authority to restructure their own charter of government, as to the most fundamentally redefining of these changes, this restructuring will be done only after the most reflective and deliberative processes of decision-making. And my further assessment persuades me that the "people" would find "fundamentally redefining" a restructuring of their Constitution that deprived them and their chosen representatives of any role in the foundational process of our system of self-government-- the process by which election districts are established, citizens are joined together or separated by political boundaries, and the building blocks of our governing institutions are determined. Inserted in place is the governance of 13 randomly selected "people" entirely lacking in any democratic or electoral relationship with the other 10 million "people" of this state or their elected representatives. In the end, the "people" must be allowed to do as they see fit; they can diminish the realm of governance of their representatives (and substitute in its place an "independent" and unaccountable commission) and they can dilute the relationship between themselves and their representatives, but the "people," as I understand them to have spoken through their Constitution, have also insisted that, before a change of this magnitude takes place, a serious and considered public conversation must *first* take place, affording opportunities for sustained and focused debate, give-and-take, compromise, and modification.

Furthermore, references to the fact that the commission is to be "independent" obscures the fundamental change that the proposed measure would make to the "people's" Constitution as well; the great value of our Constitution is not the "independence" of public bodies but rather the separation of powers and the checks and

3

balances that define relationships between public bodies and thereby limit and constrain their authority. While the VNP commission would indeed be "independent," most conspicuously, it would be "independent" of the people's representatives in the Legislature, independent of the people, and independent of the processes of self-government, especially the processes by which the "people"-- in whose name both VNP and the majority purport to speak-- exert their impact upon the "foundational" process of redistricting. Our constitutional heritage is poorly described by advocates of this proposal as one predicated upon the "independence" of public bodies; it is far better described as predicated upon the exercise of public authority that is limited, separated, subject to appropriate checks and balances, and accountable to the citizenry. The proposed new commission is grounded upon none of these. Whatever its merits, the creation of this commission would effect "fundamental" change upon both our constitutional charter and the system of government operating under this charter. It thus clearly warrants the kind of careful deliberation best afforded by the processes of constitutional "revision" set forth in Article 12, § 3 of this state's Constitution.

## II. BACKGROUND

The people have reserved to themselves the authority to modify the Constitution by petition and popular vote. "This Court has consistently protected the right of the people to amend their Constitution in this way, while enforcing constitutional and statutory safeguards that the people placed on the exercise of that right." *Protect Our Jobs v Bd of State Canvassers*, 492 Mich 763, 772; 822 NW2d 534 (2012). Indeed, a

4

century ago, in *Scott v Secretary of State*, 202 Mich 629, 643; 168 NW 709 (1918), this Court stated:

> Of the right of qualified voters of the State to propose amendments to the Constitution by petition it may be said, generally, that it can be interfered with neither by the legislature, the courts, nor the officers charged with any duty in the premises. *But the right is to be exercised in a certain way and according to certain conditions*, the limitations upon its exercise, like the reservation of the right itself, being found in the Constitution. [Emphasis added.]

In the instant case, we must decide whether the right is being exercised "in a certain way and according to certain conditions . . . being found in the Constitution." *Id*.

Const 1963, art 12, § 2 addresses amendments of the Constitution through the initiative process and provides:

> Amendments may be proposed to this constitution by petition of the registered electors of this state. Every petition shall include the full text of the proposed amendment, and be signed by registered electors of the state equal in number to at least 10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected. Such petitions shall be filed with the person authorized by law to receive the same at least 120 days before the election at which the proposed amendment is to be voted upon. Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law. The person authorized by law to receive such petition shall upon its receipt determine, as provided by law, the validity and sufficiency of the signatures on the petition, and make an official announcement thereof at least 60 days prior to the election at which the proposed amendment is to be voted upon.
>
> Any amendment proposed by such petition shall be submitted, not less than 120 days after it was filed, to the electors at the next general election. Such proposed amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law. Copies of such publication shall be posted in each polling place and furnished to news media as provided by law.

5

The ballot to be used in such election shall contain a statement of the purpose of the proposed amendment, expressed in not more than 100 words, exclusive of caption. Such statement of purpose and caption shall be prepared by the person authorized by law, and shall consist of a true and impartial statement of the purpose of the amendment in such language as shall create no prejudice for or against the proposed amendment.

If the proposed amendment is approved by a majority of the electors voting on the question, it shall become part of the constitution, and shall abrogate or amend existing provisions of the constitution at the end of 45 days after the date of the election at which it was approved. If two or more amendments approved by the electors at the same election conflict, that amendment receiving the highest affirmative vote shall prevail.

Const 1963, art 12, § 3 addresses general revisions of the Constitution through the convention process and provides:

At the general election to be held in the year 1978, and in each 16th year thereafter and at such times as may be provided by law, the question of a general revision of the constitution shall be submitted to the electors of the state. If a majority of the electors voting on the question decide in favor of a convention for such purpose, at an election to be held not later than six months after the proposal was certified as approved, the electors of each representative district as then organized shall elect one delegate and the electors of each senatorial district as then organized shall elect one delegate at a partisan election. The delegates so elected shall convene at the seat of government on the first Tuesday in October next succeeding such election or at an earlier date if provided by law.

The convention shall choose its own officers, determine the rules of its proceedings and judge the qualifications, elections and returns of its members. To fill a vacancy in the office of any delegate, the governor shall appoint a qualified resident of the same district who shall be a member of the same party as the delegate vacating the office. The convention shall have power to appoint such officers, employees and assistants as it deems necessary and to fix their compensation; to provide for the printing and distribution of its documents, journals and proceedings; to explain and disseminate information about the proposed constitution and to complete the business of the convention in an orderly manner. Each delegate shall receive for his services compensation provided by law.

No proposed constitution or amendment adopted by such convention shall be submitted to the electors for approval as hereinafter provided unless by the assent of a majority of all the delegates elected to and serving in the convention, with the names and vote of those voting entered in the journal. Any proposed constitution or amendments adopted by such convention shall be submitted to the qualified electors in the manner and at the time provided by such convention not less than 90 days after final adjournment of the convention. Upon the approval of such constitution or amendments by a majority of the qualified electors voting thereon the constitution or amendments shall take effect as provided by the convention.

This Court has long recognized that there is a rational *distinction* between an "amendment" and a "revision." *Kelly v Laing*, 259 Mich 212; 242 NW 891 (1932); *Sch Dist of City of Pontiac v City of Pontiac*, 262 Mich 338, 345; 247 NW 474 (1933). In *Kelly*, this Court addressed this distinction in the context of proposed changes to a municipality's home-rule charter. As we then explained:

Revision implies a re-examination of the whole law and a redraft without obligation to maintain the form, scheme, or structure of the old. As applied to fundamental law, such as a constitution or charter, it suggests a convention to examine the whole subject and to prepare and submit a new instrument, whether the desired changes from the old be few or many. Amendment implies continuance of the general plan and purport of the law, with corrections to better accomplish its purpose. Basically, *revision suggests fundamental change, while amendment is a correction of detail*. [*Kelly*, 259 Mich at 217 (emphasis added).]

Furthermore:

*An amendment is usually proposed by persons interested in a specific change and little concerned with its effect upon other provisions of the charter*. The machinery of revision is in line with our historical and traditional *system of changing fundamental law by convention*, which experience has shown best adapted to make necessary readjustments. [*Id.* at 221-222 (emphasis added).]

Finally, we held in *Kelly* that "[b]oth from the number of changes in the charter and the *result upon the form of government*, the proposal to abolish the office of city manager

7

requires revision of the charter and must be had by the method the statute provides therefor." *Id*. at 223-224 (emphasis added).[1]

Subsequently, in *Pontiac Sch Dist*, 262 Mich at 345, we held that a proposed amendment regarding property taxes constituted an amendment, rather than a revision, because it "*does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment by way of an addition to the Constitution.*" (Emphasis added.)[2]

---

[1] The majority argues that *Kelly*'s discussion of the distinction between an amendment and a revision is dictum. I respectfully disagree. *Kelly* held that the proposal at issue could not be placed on the ballot because "[t]he petition on its face is not in the form required by law . . . ." *Kelly*, 259 Mich at 216. However, *Kelly* also went on to hold that the proposal could not be placed on the ballot because it was a revision rather than an amendment. *Id*. at 223-224. In other words, *Kelly* held that the proposal could not be placed on the ballot for two independent reasons. That does not mean that one of those reasons is dictum, because it is well established that "where there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter, but each is the judgment of the court, and of equal validity with the other." *United States v Title Ins & Trust Co*, 265 US 472, 486; 44 S Ct 621; 68 L Ed 1110 (1924) (quotation marks and citation omitted). See also *Massachusetts v United States*, 333 US 611, 623; 68 S Ct 747; 92 L Ed 968 (1948) (Where a case has "been decided on either of two independent grounds" and "rested as much upon the one determination as the other," the "adjudication is effective for both."); *Richmond Screw Anchor Co, Inc v United States*, 275 US 331, 340; 48 S Ct 194; 72 L Ed 303 (1928) ("It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion."). Furthermore, while the discussion in *Kelly* in support of the first rationale is less than two pages, the discussion in support of the second rationale is eight pages. There are no grounds for considering the first rationale binding precedent but not the second.

[2] The majority does not explain why it does not believe *Pontiac Sch Dist* to be binding precedent, other than to note that *Pontiac Sch Dist* "summarily" rejected the argument that the proposed amendment constituted a revision. Whatever the length of its analysis, *Pontiac Sch Dist* is fully consistent with the text of the Constitution, other Michigan precedent, and, indeed, as discussed later, even with the majority's application of its own

8

Thereafter, in *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 305; 761 NW2d 210 (2008) (*Citizens*), the Court of Appeals held that "in order to determine whether a proposal effects a 'general revision' of the constitution, and is therefore not subject to the initiative process established for amending the constitution, the Court must consider *both the quantitative nature and the qualitative nature of the proposed changes*." (Emphasis added.) "More specifically, the determination depends on not only the number of proposed changes, or whether a wholly new constitution is being offered, but on the *scope of the proposed changes* and the *degree to which those changes would interfere with, or modify, the operation of government*." *Id*. (emphasis added). The Court of Appeals ruled that the Reform Michigan Government Now! (RMGN) proposal constituted a general revision, *id*. at 307,

---

standard that it adopts today. Moreover, in its discussion of this case, the majority somehow finds it relevant to observe, "[W]e decline to accept . . . that the only purpose of our constitutional provisions is to make the government run as efficiently as possible." (Quotation marks and citation omitted.) To whom exactly is the majority purporting to respond by this observation out of nowhere? Who exactly is asserting to the contrary? Certainly, no one on this dissenting opinion or in the *Pontiac Sch Dist* opinion. While the majority accuses this dissent of "labor[ing] to give its rule some provenance by repeatedly citing the age of the cases [it] relies upon," why exactly should that *not* be thought a relevant consideration? Why exactly should it *not* be thought relevant that the *best* and most *authoritative* and most *consistent* precedents of this Court and of our Court of Appeals are of a reasonably settled and longstanding character? If there is any "laboring" undertaken in our respective opinions, it seems as if the lion's share takes place within the confines of the majority opinion in distinguishing in secondary ways what are inarguably the most compelling precedents of this state-- imperfect as we have acknowledged these to be. And as we have argued elsewhere, even the majority itself, by its specific inquiries into the impact of the VNP proposal, inquires of things that are largely *consistent* with these precedents, although it does so in pursuit of a new test-- one that *lacks* any provenance within the judicial precedents of this state.

and this Court affirmed in an order, *Citizens Protecting Michigan's Constitution v Secretary of State*, 482 Mich 960 (2008).[3]

---

[3] Justices CAVANAGH, WEAVER, and myself joined in a concurrence affirming the Court of Appeals' decision because the RMGN proposal "clearly cannot be reasonably communicated to the people in 'not more than 100 words,' " *id*. at 961 (CAVANAGH, WEAVER, and MARKMAN, JJ., concurring), while Justice WEAVER wrote a separate concurrence criticizing the Court of Appeals for reading California law into Michigan law, *id*. at 962 (WEAVER, J., concurring). Justice CORRIGAN, joined by Chief Justice TAYLOR and Justice YOUNG, wrote a concurrence in support of the Court of Appeals, *id*. at 964 (CORRIGAN, J., concurring), and Justice KELLY wrote a dissent that would have remanded to the Board of Canvassers for the submission of a 100-word statement of the purpose of the initiative, *id*. (KELLY, J., dissenting). The RMGN proposal would have effected an array of changes to the Constitution, including reductions in numbers of state legislators and judges, granting citizen standing for certain environmental lawsuits, and limiting lobbying activities.

The majority contends that this opinion "engages in revisionist legal history when it asserts that our precedents in this area have established 'longstanding standards' on this point that are 'consistent and compatible with each other, as well as with what is required by our Constitution' " because "if the standard set forth in *Laing* and *Pontiac Sch Dist* and the Court of Appeals decisions in *Citizens* and *Protect Our Jobs* was so clear and longstanding on this point, one wonders why this Court refused to adopt it in 2008 in *Citizens*, instead issuing a highly unusual order leaving this area of law in a state of limbo." While I cannot speak as to the intentions of any other justice in 2008, I *can* offer that I joined a short concurring statement in that case that held that the proposal before the Court was not an amendment under Const 1963, art 12, § 2, for what I viewed as the simplest and most straightforward of reasons-- it could not be reasonably summarized in 100 words or less; it was far too expansive in its reach and impact. Nothing in that statement suggested in any way that I rejected the standard set forth in the instant case or any other standard, merely that in the context of what was then also an election emergency, there was simply no time-- and even more importantly, no *need*-- to assess or to apply the more nuanced and difficult standard articulated today. In the present case, on the other hand, the "100 words or less" standard is, in my judgment, the standard that is more difficult to apply and one that was not addressed by the lower court. Furthermore, given that the *Citizens* standard was derived from both *Kelly* and *Pontiac Sch Dist*, each of which constitutes binding precedent, and given that *Citizens* itself was a published opinion and thus constitutes a *further* binding precedent, the law was hardly left in any "state of limbo," *even* within the context of the difficult and exigent

10

Most recently, in *Protect Our Jobs v Bd of State Canvassers*, unpublished per curiam opinion of the Court of Appeals, issued August 27, 2012 (Docket No. 311828), addressing whether a proposed amendment concerning collective bargaining rights was a general revision or an amendment, the Court of Appeals reasoned that the proposed initiative was an amendment because it "is limited to a single subject matter, and it only directly adds one section to the constitution and changes one other . . . ." *Id*. at 2. The panel further held that "[t]he initiative proposal here is far more akin to a *correction of detail than a fundamental change*, when viewed in the proper context of the constitution as a whole." *Id*. at 2-3 (emphasis added). On appeal, this Court affirmed, but on wholly different grounds dealing with the republication requirement. *Protect Our Jobs*, 492 Mich 763.

### III. STANDARDS

What I believe fairly can be derived from these decisions is that for at least the past 85 years in Michigan, governing law concerning direct constitutional change has been characterized by the following: (a) *alternative* constitutional procedures exist for instituting such change and (b) determining *which* of these procedures is to be utilized in a particular instance requires an assessment of the "qualitative nature" of the proposed change-- that is, the extent to which the proposal "[impacts] our form of government,"

---

circumstances that the majority should well understand attend our election emergency cases. The majority also opines that the *Citizens* standard "comes from a line of California caselaw . . . ." In part, this is so, and in part, it is not, because the majority in *Citizens* largely relied on *Kelly* and *Pontiac Sch Dist*; while it did also rely on California law, it did not do so in any different manner than does the majority in the present case.

entails "fundamental" change, or "would interfere with, or modify, the operation of government." While these standards have been phrased differently over time in judicial decisions, they are nonetheless consistent in supplying this common guidance.

While reasonable persons therefore may articulate these standards in slightly different ways, as indeed might the justices on this dissent, these standards are nonetheless consistent and compatible with each other, as well as with what is required by our Constitution, in distinguishing between the realms of the initiative and the convention. And while election disputes tend disproportionately to arise in the same circumstances as this case, this counsels in favor of greater rather than lesser deference to reasonably settled standards, while the majority purports to alter these standards. I say "purports" because, as discussed in further detail later, I do not believe that the majority's *application* of its standard in this case is actually all that different from these longstanding standards, only that the majority articulates its standard in a novel manner.

The Court of Appeals in the instant case purported to apply the standards set forth in *Citizens* and *Protect Our Jobs*. *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich App ___; ___ NW2d ___ (2018) (Docket No. 343517) (*CPMC*). The first question then concerns whether these decisions articulated the proper standard for determining whether a proposal constitutes an "amendment" or a "revision," and I believe that they do, although I would clarify several points. Most importantly, I believe that the ultimate judicial assessment depends most upon the *qualitative* nature of the proposed changes, i.e., whether these would "fundamentally" alter the nature or operation of our government. Although the *quantitative* nature of the proposed changes may sometimes also be relevant in this assessment, it is not determinative or even on an

12

equal footing with the qualitative nature of the proposed changes.  For example, if there were a proposal to modify all the references to "he" in the Constitution with "he or she," that would constitute a substantial quantitative change.  However, it would not seemingly implicate anything fundamental in a qualitative sense, and therefore the proposal would almost certainly constitute an "amendment" rather than a "revision."  On the other hand, if there were a proposal to transform the position of the governor into a lifetime appointment, although this would require relatively few textual modifications in the Constitution, such a change would be significant in a qualitative sense, and therefore the proposal would likely constitute a "revision" rather than an "amendment."  Accordingly, I would clarify the focus of our caselaw to emphasize the qualitative impact of the proposed changes rather than the quantitative impact.

Similarly, I would clarify that while the sheer number of subjects to which a proposal pertains is also a relevant consideration, it is for the same reason as just observed pertaining to the sheer number of textual changes, not necessarily a dispositive consideration.  For example, if there was a proposal to change our Legislature from bicameral to unicameral, although that would relate to a single subject, it would nonetheless constitute a fundamental change to the nature and operation of our government and therefore would constitute a "revision" rather than an "amendment."[4]

---

[4] Since statehood, Michigan has vested the legislative power in a bicameral legislature consisting of a Senate and a House of Representatives.  See Const 1835, art 4, § 1; Const 1850, art 4, § 1; Const 1908, art 5, § 1; Const 1963, art 4, § 1.  Moreover, the federal government and every state government with the exception of one also provide for a bicameral legislature.  US Const, art I, § 1; see Rodriguez, *Turning Federalism Inside Out: Intrastate Aspects of Interstate Regulatory Competition*, 14 Yale L & Pol'y Rev

Article 12, § 2 of Michigan's 1963 Constitution requires the ballot to contain "a statement of *the purpose* of the proposed amendment . . . ." (Emphasis added.) Because "the" is a definite article and "purpose" is a singular noun, it seems reasonably clear that this phrase "statement of the purpose of the proposed amendment" likely contemplates a single purpose. See *Robinson v Detroit*, 462 Mich 439, 462; 613 NW2d 307 (2000). Therefore, if a proposal contains multiple purposes, it would not seem to constitute an amendment under Const 1963, art 12, § 2. However, this is not the *only* constitutional limitation on the meaning of an amendment.[5] In other words, although a proposal that contains multiple purposes cannot be considered an amendment under Const 1963, art 12, § 2, a proposal that contains a single purpose is not *necessarily* an amendment under that same provision.

---

149, 163 (1996).

[5] Indeed, the same language in Const 1963, art 12, § 2 requiring "a statement of the purpose of the proposed amendment" proceeds in the same sentence to require that this statement be "expressed in not more than 100 words," and this effectively imposes another limitation on the breadth of an amendment. In *Citizens*, 482 Mich at 960, three justices joined in asserting that "[t]his language establishes a clear limitation on the scope of constitutional amendments under § 2." In other words, a proposal that "cannot be reasonably [and presumably fully] communicated to the people in 'not more than 100 words' " cannot be considered an amendment for purposes of Const 1963, art 12, § 2. *Id*. at 961. However, the Court of Appeals in the instant case held that "[t]he above language does not impose, or even suggest, limitation on the scope of a voter initiative proposing a constitutional amendment." *CPMC*, ___ Mich App at ___; slip op at 14. While I disagree with the Court of Appeals on that point, I *do* agree with the Court that the distinctive purposes and processes set forth by §§ 2 and 3 (amendments and revisions) further impose a limitation on the scope of proposed voter-initiated changes to our Constitution.

Article 12 of Michigan's Constitution sets forth two very different ways by which our Constitution can be directly modified.[6] One way is by the amendment process set forth in Const 1963, art 12, § 2. This process requires the supporters of a proposed amendment to obtain a certain number of signatures from registered electors of the state in order for the proposal to be placed on the ballot, i.e., "10 percent of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected," and then once it is placed on the ballot, it requires "approv[al] by a majority of the electors voting on the question . . . ." *Id.* The other way the Constitution can be directly modified is by the revision process set forth in Const 1963, art 12, § 3. This process requires a majority of electors to vote in favor of a convention; it then requires electors to choose delegates; it then requires delegates to meet, deliberate, and propose new constitutional language; and finally, it requires a majority of qualified electors to support the new or modified constitutional language.

The latter obviously sets forth a lengthier and more deliberative process. It is a process by which issues can be thoroughly discussed and debated in a structured and sustained manner, and in which proposed language can be clarified and refined. It is also a process in which give-and-take among persons of disparate viewpoints can be pursued, proposals and counterproposals fleshed out, compromises undertaken, and risks to our historical form of government assessed and minimized. That is, it is a process

---

[6] Article 12 actually sets forth a third way by which our Constitution can be modified, i.e., an amendment by legislative proposal and a vote of electors, Const 1963, art 12, § 1, but that mode of constitutional change is not at issue in this case.

15

considerably different from the amendment process in which voters, after a reasonably brief period of consideration (roughly 90 days in the present case), and after a very different type of public debate, must accept or reject the proposed amendment in whole. It makes sense that our Constitution would provide, and our Court would recognize, as both have for the past 85 years, that there are distinctions between "amendments" and "revisions" and that each process serves a distinctive need within our governmental and constitutional systems. The broader and the more fundamental the proposed changes, the more likely these would be of a character requiring the deliberativeness of the convention process; the more discrete and limited the proposed changes, the more likely these would be of a character requiring the expedition of the initiative process.[7]

---

[7] Although I recognize that this is not a bright-line test and that reasonable people, and judges, will sometimes disagree as to whether a particular constitutional proposal does or does not call for "fundamental" change, this test nonetheless is compatible with constitutional text, our judicial precedents, and the evident purposes of the alternative processes contained in Article 12. Furthermore, this is hardly the first area of the law in which a court has been required to address whether something is "fundamental" or not. See, e.g., *AFT Mich v Michigan*, 497 Mich 197, 245; 866 NW2d 782 (2015) (stating that whether a law infringes on "fundamental rights" is relevant in the context of a substantive due-process claim); *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 326; 806 NW2d 683 (2011) (stating the same with regard to an Equal Protection Clause claim); *McBurney v Young*, 569 US 221, 226; 133 S Ct 1709; 185 L Ed 2d 758 (2013) ("[T]he Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.' "); *Slaughter-House Cases*, 83 US (16 Wall) 36; 21 L Ed 394 (1872) (stating the same with regard to the Privileges and Immunities Clause). Principally, however, what is most important in establishing a proper judicial test is not the extent to which it avoids disagreements, or mechanically compels a determination, but the alignment of the test, as best as this can be done, with the underlying legal question to be resolved.

For the reasons generally set forth in this opinion, I disagree with the majority that the standard set forth by our precedents over 85 years ago is not reasonably grounded in the text of the Constitution itself or that I myself "do[] not engage in a textual analysis of our Constitution[.]" Given that the people decided to incorporate two very different processes of modifying the Constitution, these differences must be given meaning, and one way by which to do this, in addition to assessing text and caselaw, is to examine the manifest purposes of these alternative processes in light of their respective strengths and weaknesses. Such an analysis makes reasonably clear that the people intended for broader and more fundamental changes to the Constitution to be accomplished by way of the general revision/convention process, while more narrow and discrete changes would be accomplished by way of the amendment/initiative process. This understanding is reinforced by the fact that when the people adopted the 1963 Constitution containing these alternative processes, *Kelly* and *Pontiac Sch Dist* had already been decided; therefore, the people already would have been apprised that this reflected the judicial understanding of the differences between the two processes. See *People v Nutt*, 469 Mich 565, 575; 677 NW2d 1 (2004) ("We conclude that, at the time of the ratification of our 1963 Constitution, the people of this state intended that the words 'same offense' be construed consistent with state and federal double jeopardy jurisprudence as it then existed."). In other words, this would have been the "common understanding" of the people at the time the 1963 Constitution was ratified. See *Goldstone v Bloomfield Twp Pub Library*, 479 Mich 554, 558; 737 NW2d 476 (2007) ("When interpreting constitutional provisions, our primary objective is to realize the intent of the people by whom and for whom the constitution was ratified. That is, we seek the 'common

17

understanding' of the people at the time the constitution was ratified.") (quotation marks and citation omitted).

Furthermore, I do not believe that the majority's standard is any less "vague" than the standard set forth by our precedents over the course of 85 years. Indeed, I do not believe that the majority's standard, in particular its *application* of that standard, is very much different from the standard set forth by our precedents. This is especially true when one looks to the meaning that the majority ascribes to "changes that are tantamount to the creation of a new constitution."[8] The majority articulates the standard in terms of

---

[8] To the extent the majority holds that a proposed change must be "tantamount to creating a new constitution" in order to be considered something other than an "amendment," I strongly disagree and see no constitutional basis for this conclusion. But I see much constitutional basis for the contrary conclusion, namely, that by evaluating the distinctive elements of the initiative and convention processes, one gains reasonable insight as to the distinctive application of each, and therefore a proposal constitutes an "amendment" unless it would "fundamentally" alter the nature or operation of our government. I do not believe the majority's test is warranted by precedent or the text of the Constitution. Although *Kelly*, 259 Mich at 217, does refer to a revision in terms of creating "a new instrument," it proceeds to hold that a "revision suggests fundamental change, while amendment is a correction of detail." In addition, *Pontiac Sch Dist*, 262 Mich at 345, held that the proposed change in that case constituted an amendment because it "does not so interfere with or modify the operation of governmental agencies as to render it other than an amendment . . . ." And *Citizens*, 280 Mich App 273, and *Protect Our Jobs*, unpub op, each focused on the scope of the proposed changes and the degree to which those changes would interfere with, or modify, the operation of government. Our precedents viewed as a whole do not stand for the proposition that anything short of creating an entirely new constitution must be considered an "amendment." And although the majority's standard on its face certainly appears to be in accord with this flawed proposition, reading the majority opinion as a whole, especially its actual *application* of its own standard, I do not believe this to be an accurate summation of what the majority *itself* is engaged in doing in the present case. That is, although the majority employs the "new constitution" language to describe its own standard, its actual analysis of the VNP proposal falls short of inquiring whether it would actually yield a "new constitution." There is considerable room under our Constitution between an "amendment" and the

18

whether the proposal "propose[s] changes that significantly alter or abolish the form or structure of our government in a way that is tantamount to creating a new constitution." *Kelly*, too, spoke of a revision in terms of creating "a new instrument," producing "fundamental change," and changing "the result upon the form of government . . . ." *Kelly*, 259 Mich at 217, 223-224. Similarly, *Pontiac Sch Dist* spoke in terms of whether the proposal would "so interfere with or modify the operation of governmental agencies as to render it other than an amendment . . . ." *Pontiac Sch Dist*, 262 Mich at 345.[9]

The majority, to its credit, does not hold that any changes short of a total rewrite of the Constitution can be considered an "amendment." Rather, the majority recognizes that an amendment is "limited to proposing less sweeping changes," and the majority focuses, just as I do, on the "qualitative" significance of the proposed changes to determine whether the changes would significantly alter our government, as the majority recognizes that "[a] constitution . . . is more than words on a page," "[i]ts most basic functions are to create the form and structure of government, define and limit the powers of government, and provide for the protection of rights and liberties," and "[t]hese are the basic threads of

---

creation of an entirely new constitution.

[9] Given the resemblances between the majority's own standard (or at least its *application* of that standard) and our state's judicial precedents, it is ironic that the majority would remark that "it would be euphemistic to say that these cases have created a judicial gloss supporting the dissent's reasoning—instead, they appear to us more like a spray-on tan." The majority thus rejects the *best* and the most *enduring* relevant precedents of this state in developing its own test, disparages these precedents as tantamount to a "spray-on tan," and then, notwithstanding, proceeds reasonably to *apply* the very precedents it has both rejected and disparaged. While we respectfully disagree with the majority's ultimate conclusions, we do not find these to be indefensible or outrageous, merely less defensible and less reasonable than those reached in this dissent.

19

a constitution, and when they are removed, replaced, or radically rewoven, the whole tapestry of the constitution may change." Well said![10] Indeed, in its application section, the majority considers, just as I do, the extent to which the VNP proposal would take power away from the three different branches of government, i.e., how the proposed changes would "affect the branches' relative powers," for example, "how the proposal would change the present Constitution with regard to the Legislature," whether "[t]he executive branch [would be] significantly affected by the proposal," and how "VNP's proposal [would] change[] the judicial branch's role in the redistricting process." In other words, although the majority and I reach very different conclusions, I do not believe that our tests are all that different; we engage in similar inquiries and consider in common whether the proposed changes would fundamentally alter our system of government.

To emphasize again, it is not that the people in Michigan, if they choose to do so, cannot *radically* restructure their government by the direct processes of constitutional change (subject, of course, to federal constitutional requirements, such as the obligation of states to preserve a "Republican [or representative] Form of Government," US Const, art IV, § 4), but merely that the most *consequential* of proposed changes require greater forethought and deliberation. This is a precondition for direct constitutional change prudently recognized 100 years ago-- a century before today's "emergency" decision-- when this Court observed that the process of direct change must be carried out "in a

---

[10] Well said, but less well applied. Does the majority not believe that the "basic threads of [*our*] constitution" might be understood as consisting in part of our system of separated powers, checks and balances, and representative self-government?

certain way and according to certain conditions . . . found in the Constitution." *Scott*, 202 Mich at 643.

## IV. PRESENT CONSTITUTION

In order to determine whether the VNP proposal would fundamentally alter the nature or operation of our government and Constitution, we must obviously understand the manner in which these *presently* operate. We begin with what the Constitution, ratified in 1963, originally stated, although we have not operated under that system for the past 36 years. The Constitution as ratified in 1963 called for state legislative districts to be apportioned under a weighted formula based on land area and population. Const 1963, art 4, §§ 2 and 3. It also provided that senatorial districts should be "compact, convenient, and contiguous by land, [and] as rectangular in shape as possible . . . ." Const 1963, art 4, § 2(2). In addition, house districts were to "consist of compact and convenient territory contiguous by land." Const 1963, art 4, § 3. It also established a commission on legislative apportionment "consisting of eight electors, four of whom shall be selected by the state organizations of each of the two political parties whose candidates for governor received the highest vote at the last general election at which a governor was elected preceding each apportionment." Const 1963, art 4, § 6. And it provided that the commission should "receive compensation provided by law" and that the Legislature should "appropriate funds to enable the commission to carry out its activities." *Id*. With regard to this Court's involvement in redistricting, that Constitution also provided:

> If a majority of the commission cannot agree on a plan, each
> member of the commission, individually or jointly with other members,

21

may submit a proposed plan to the supreme court. The supreme court shall determine which plan complies most accurately with the constitutional requirements and shall direct that it be adopted by the commission and published as provided in this section.

Upon the application of any elector filed not later than 60 days after final publication of the plan, the supreme court, in the exercise of original jurisdiction, shall direct the secretary of state or the commission to perform their duties, may review any final plan adopted by the commission, and shall remand such plan to the commission for further action if it fails to comply with the requirements of this constitution. [*Id*.]

However, in *Reynolds v Sims*, 377 US 533, 577; 84 S Ct 1362; 12 L Ed 2d 506 (1964), the United States Supreme Court ruled that weighted land area/population formulas violated the Equal Protection Clause and that states must "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable."[11] In *In re Apportionment of State Legislature—1982*, 413 Mich 96, 116; 321 NW2d 565 (1982), this Court held that "[t]he weighted land area/population formulae, invalidated by *Reynolds v Sims* . . . and the remaining apportionment rules of art 4, §§ 2-6, are inextricably interdependent and therefore are not severable." "Similarly, the function of the commission, which depends on those rules,

---

[11] But *Reynolds* also held that "[s]o long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature." *Id*. at 579. And the Court subsequently held that "the State's policy of maintaining the integrity of political subdivision lines" is a "rational state policy." *Mahan v Howell*, 410 US 315, 325, 328; 93 S Ct 979; 35 L Ed 2d 320 (1973). It also held that a 16.4% deviation from exact population equality did not violate the Equal Protection Clause if it was done in furtherance of such a rational state policy. *Id*. at 329.

and indeed the commission itself, are not severable from the invalidated rules." *Id*.

Accordingly, this Court struck down both the apportionment rules and the commission itself.[12]

Subsequently, the Legislature, in 1996, enacted guidelines for the redistricting of the Senate and House of Representatives, see MCL 4.261 *et seq*., and, in 1999, it enacted the Congressional Redistricting Act, MCL 3.61 *et seq*. Thus, after the past two federal decennial censuses, redistricting has occurred without a commission, as the Legislature has decided the districts. The commission originally formulated in the 1963 Michigan

---

[12] The majority highlights that this Court in *In re Apportionment of State Legislature— 1982*, 413 Mich at 139-140, opined that "[t]he power to redistrict and reapportion the Legislature remains with the people," but that "[t]he people, however, can only exercise that power, as a practical matter, by amending the constitution . . . ." I do not disagree in any way with the proposition that the power to redistrict and reapportion the Legislature remains with the people. Nor do I disagree that the people can alter the power of redistricting by amending the Constitution. However, the issue here is whether the *specific* proposal offered by VNP does so in a manner that can be properly characterized as an amendment, as that term is used in Const 1963, art 12, § 2, a question that was obviously not considered by this Court in *In re Apportionment of State Legislature— 1982*. In other words, I do not believe that *any* measure pertaining to redistricting would thereby be rendered inapt for consideration by the initiative process, only that the *particular* measure before us today does not, in my judgment, satisfy constitutional standards. For similar reasons, I do not find statements made at the constitutional convention suggesting that voter-initiated amendments could be adopted regarding redistricting to be as illuminating as does the majority. Of course, voter-initiated amendments regarding redistricting may well be compatible with *either* Const 1963, art 12, § 2 or Const 1963, art 12, § 3, for there are no limitations in these provisions concerning subject matter, cf. US Const, art IV, § 4. I simply believe that the *present* proposal is compatible only with the convention process of voter-initiated change.

Constitution has not been active since 1972, and it has in no way been a part of that Constitution since 1982.[13]

MCL 4.261 grants the Legislature the authority to enact a redistricting plan and sets forth the guidelines that it must follow. This Court has original and exclusive jurisdiction to hear and decide all cases or controversies involving a redistricting plan. MCL 4.262(1). This Court has the authority to modify the plan or remand the plan to a special master for further action if the plan fails to comply with the statutory requirements. MCL 4.262(3). If the Legislature fails to enact a redistricting plan before the deadline, this Court has the authority to create a redistricting plan. MCL 4.263. To summarize, the redistricting commission created by the 1963 Constitution was shortly thereafter struck down and in its place the people, through their elected representatives, restored the power to redistrict back to the Legislature.[14]

---

[13] I am cognizant that the commission met in 1982 and proposed redistricting plans, but this Court rejected those plans and also struck down that part of the Constitution creating the commission. *In re Apportionment of State Legislature—1982*, 413 Mich at 116.

[14] The majority asserts that "the last time the voters had *direct input* on this issue, they opted for apportionment and redistricting to be conducted by a commission." (Emphasis added.) Well, that is a finely put observation, but only if one chooses to ignore the entirety of the "indirect input" in representative self-government in which the people have been engaged during the ensuing 55 years (as well as for the previous 125 years of our state's history). During that time, the people have been free to petition or otherwise to encourage their legislators to reinstate some form of commission; they have been free to elect judges and justices who might reconsider the lack of constitutionality of the former commission; they have been free to call for conventions or initiatives that might propose a new form of commission; and they have been free to urge upon their representatives whatever other alternatives to the redistricting status quo they desire. Indeed, the lack of involvement of the commission during the past four redistricting cycles, and the Legislature's involvement during the past two cycles, might have been

24

## V. VNP PROPOSAL

The VNP proposal would strike all that is currently in the Constitution regarding redistricting and in Article 4, § 6 would create an "independent citizens redistricting commission."[15]  Article 4, § 6(1) would provide that the commission shall consist of 13 commissioners, each of whom would have to complete an application and attest under oath that he or she does or does not affiliate with one of the two major political parties. VNP proposal, art 4, § 6(2)(A)(III).  Each commissioner would also have to:

thought sufficient to prompt some or all of these actions if they had been viewed as critical by the people.

Furthermore, none of the above discussion has anything to do with "legislative acquiescence."  While it is kind of the majority to cite one of my own writings in its explanation of this doctrine, and while its analysis of the doctrine seems to me correct, it is nonetheless irrelevant in the present context.  If the purpose of the above discussion had been to assert that the Legislature, by failing to replace the commission struck down in 1982, had thereby shown its *opposition* to the commission, *that* would have been an exercise in the dubious assertion of "legislative acquiescence"-- although even this gives short shrift to the fact that the doctrine is exclusively one of statutory interpretation and that there is no statute here whose meaning is being considered by either this dissent or the majority.  Instead, the only purpose of the above discussion is to respond to the majority that the Constitution as ratified in 1963 continues in all respects to reflect the best *present* intentions of the people, despite that Constitution not having been in existence in relevant respects since 1982, and despite ample *opportunities* since then for the people to have revived or restored the commission by a variety of constitutional means.

Finally, it warrants clarification that the "direct input" in 1963 to which the majority hearkens is exactly the kind of input that this dissent would facilitate-- a statewide convention-- except that *this* convention, unlike that in 1963, which involved a complete rewrite of the Constitution and in which voters cast no specific vote on a redistricting commission, would focus *exclusively* upon this matter.

[15] The VNP proposal would also render all the statutes enacted by the Legislature regarding redistricting unconstitutional.

25

(B) not currently be or in the past 6 years have been any of the following:

(I) a declared candidate for partisan federal, state, or local office;

(II) an elected official to partisan federal, state, or local office;

(III) an officer or member of the governing body of a national, state, or local political party;

(IV) a paid consultant or employee of a federal, state, or local elected official or political candidate, of a federal, state, or local political candidate's campaign, or of a political action committee;

(V) an employee of the Legislature;

(VI) any person who is registered as a lobbyist agent with the Michigan bureau of elections, or any employee of such person; or

(VII) an unclassified state employee who is exempt from classification in state civil service pursuant to article XI, Section 5, except for employees of courts of record, employees of the state institutions of higher education, and persons in the armed forces of the state.

(C) not be a parent, stepparent, child, stepchild, or spouse of any individual disqualified under part (1)(B) of this section[.] [VNP proposal, art 4, § 6(1).]

In addition, "for five years after the date of appointment, a commissioner [would be] ineligible to hold a partisan elective office at the state, county, city, village, or township level in Michigan." VNP proposal, art 4, § 6(1)(E).

The Secretary of State would have to make applications available to the general public and mail these to 10,000 registered voters "selected at random." VNP proposal, art 4, § 6(2)(A)(I). The Secretary of State would then have to "randomly" select 60 applicants for each pool of affiliating applicants and 80 applicants from the pool of nonaffiliating applicants and submit these names to the majority and minority leaders of the Senate and the Speaker of the House of Representatives and the minority leader of the

26

House of Representatives.[16]  VNP proposal, art 4, § 6(2)(D).  They would be able to each strike five applicants from any pool or pools, up to a maximum of 20 total strikes by the four legislative leaders.  VNP proposal, art 4, § 6(2)(E).  The Secretary of State would then randomly draw the names of four commissioners from each of the two pools of remaining applicants affiliating with a major party and five commissioners from the pool of remaining nonaffiliating applicants.  VNP proposal, art 4, § 6(2)(F).

Article 4, § 6(5) would provide that "the Legislature shall appropriate funds sufficient to compensate the commissioners and to enable the commission to carry out its functions, operations and activities" and that "the state of Michigan shall indemnify commissioners for costs incurred if the Legislature does not appropriate sufficient funds to cover such costs."  Article 4, § 6(6) would provide that "the commission shall have legal standing to prosecute an action regarding the adequacy of resources provided for the operation of the commission . . . ."

Article 4, § 6(13) would provide:

The commission shall abide by the following criteria in proposing and adopting each plan, in order of priority:

---

[16] "The random selection process used by the Secretary of State to fill the selection pools [would have to] use accepted statistical weighting methods to ensure that the pools, as closely as possible, mirror the geographic and demographic makeup of the state[.]"  VNP proposal, art 4, § 6(2)(D)(II).  How such "randomness" is to be reconciled with achieving a "mirroring" of the "geographic and demographic" makeup of the state is difficult to understand, but it is a matter not now before this Court.  This "random" selection process would also be predicated on all persons *self-identifying* as either Republican, Democrat, or independent, with certain classes of persons altogether excluded from the process, including elected officials, lobbyists, and their relatives.

27

(A) Districts shall be of equal population as mandated by the United States Constitution, and shall comply with the voting rights act and other federal laws.

(B) Districts shall be geographically contiguous. Island areas are considered to be contiguous by land to the county of which they are a part.

(C) Districts shall reflect the state's diverse population and communities of interest. Communities of interest may include, but shall not be limited to, populations that share cultural or historical characteristics or economic interests. Communities of interest do not include relationships with political parties, incumbents, or political candidates.

(D) Districts shall not provide a disproportionate advantage to any political party. A disproportionate advantage to a political party shall be determined using accepted measures of partisan fairness.

(E) Districts shall not favor or disfavor an incumbent elected official or a candidate.

(F) Districts shall reflect consideration of county, city, and township boundaries.

(G) Districts shall be reasonably compact.

"A final decision of the commission to adopt a redistricting plan [would] require[] a majority vote of the commission, including at least two commissioners who affiliate with each major party, and at least two commissioners who do not affiliate with either major party." VNP proposal, art 4, § 6(14)(C).

Article 4, § 6(19) would provide:

The Supreme Court, in the exercise of original jurisdiction, shall direct the Secretary of State or the commission to perform their respective duties, may review a challenge to any plan adopted by the commission, and shall remand a plan to the commission for further action if the plan fails to comply with the requirements of this Constitution, the Constitution of the United States or superseding federal law. In no event shall any body, except the independent citizens redistricting commission acting pursuant to this section, promulgate and adopt a redistricting plan or plans for this state.

Article 4, § 6(22) would provide that "the powers granted to the commission are legislative functions not subject to the control or approval of the Legislature, and are exclusively reserved to the commission."

## VI. APPLICATION

To begin with, the Court of Appeals (and now the majority) err in assessing the nature of the change that would be effected by the VNP proposal by comparing the commission to be established by VNP with the commission created by the 1963 Constitution but thereafter struck down. In short, by the time of the Court of Appeals' asserted comparison, the commission created by the 1963 Constitution had not been a part of that Constitution for 36 years and had not actually been *used* to establish a districting plan for 46 years.[17] The Legislature has been in charge of redistricting since at

---

[17] Nobody would say, for example, that the congressional term limits contained in Const 1963, art 2, § 10, which were struck down by *US Term Limits, Inc v Thornton*, 514 US 779; 115 S Ct 1842; 131 L Ed 2d 881 (1995); or the three-fifths clause of US Const, art I, § 2, superseded by the Fourteenth Amendment; or Prohibition, the Eighteenth Amendment, repealed by the Twenty-First Amendment; or the Vice President runner-up rule, US Const, art II, § 1, superseded by the Twelfth Amendment; or the apportionment requirement for income taxes, US Const, art I, § 2, superseded by the Sixteenth Amendment, remain real or operative parts of a constitution simply because these defunct provisions remain visible as bracketed antique pieces within their respective charters. It is sophistry to suggest that any of these nullified provisions define a charter of government to be deployed here for purposes of comparison with a proposed constitutional amendment whose legitimacy is dependent upon its *effect* on that constitution. That these provisions were *once* part of that charter does not mean that they remain so. *No* redistricting commission has been a part of Michigan's Constitution for at least 36 years. Contrary to the majority's contention, I do not believe that this Court possesses the authority to "actually amend the Constitution by deleting from it any text the [Court] declares to be unconstitutional," but who even understands what the majority is trying to say by this? It is really not complicated what this dissenting opinion has said-- once this Court, or the United States Supreme Court, has struck down a provision of our

29

least 1996. Therefore, the pertinent question is not whether replacing the commission created by the 1963 Constitution with the VNP commission would fundamentally change the operation of government, but whether removing the power to redistrict from the Legislature and conferring that power in the VNP commission would fundamentally change the operation of government. We are obligated to consider how the government is *currently* operating in order to make the necessary comparison, not how the government might *once* have operated. And it *currently* operates (as it has almost *always* operated in the history of our state) with the Legislature responsible for redistricting.[18]

As this Court has recognized, "[e]lection redistricting is principally a legislative function," *LeRoux v Secretary of State*, 465 Mich 594, 619; 640 NW2d 849 (2002), redistricting "goes to the heart of the political process in a constitutional democracy," *In re Apportionment of State Legislature—1982*, 413 Mich at 136, and "[a]ny change in the means by which the members of the Legislature are chosen is a *fundamental* matter," *id*.

---

Constitution, as was done in *In re Apportionment of State Legislature—1982*, 413 Mich at 116, that provision is struck down. And it is no longer a part of the Constitution. It is not, as the majority apparently believes, a part of the Constitution in abeyance, the Constitution in waiting, the backup Constitution, or the Constitution to be risen again someday. Rather, such a provision no longer has the force of law and is no longer a part of the governing charter of the state.

[18] Indeed, both before the establishment of an apportionment commission in the 1963 Constitution, dating back to 1835, and after the commission was struck down in 1982 and legislation enacted in 1996, the Legislature has always been in charge of redistricting. See Const 1835, art 4, § 3; Const 1850, art 4, § 4; Const 1908, art 5, § 4. Notably for purposes of the present case, the *only* period during which this power was completely taken from the Legislature and invested in a commission-- *any* manner of commission, much less the specific form of commission proposed by VNP-- occurred as a product of the convention process, not the initiative process.

at 136-137 (emphasis added). Indeed, one of RMGN's proposed changes would have removed from the Legislature its authority over redistricting, resituated this authority in a redistricting commission within the executive branch, and removed the procedure for judicial review of redistricting. The Court of Appeals concluded that such a proposal "affects the 'foundation power' of government by 'wresting from' the legislative branch and the judicial branch any authority over redistricting and consolidating that power in the executive branch, albeit in a new independent agency with plenary authority over redistricting." *Citizens*, 280 Mich App at 306.

The same is true in the present case. The VNP proposal would affect the "foundation" power of government by removing altogether from the legislative branch authority over redistricting and consolidating that power instead in an "independent" commission made up of 13 randomly selected individuals *who are not in any way chosen by the people, representative of the people, or accountable to the people*.[19] This, in my

---

[19] The Court of Appeals held that the VNP proposal would not wrest *complete* power from the legislative branch because "the legislature retains the power to veto potential commission members . . . ." *CPMC*, ___ Mich App at ___; slip op at 19. More precisely, the VNP proposal would allow 4 members of the Legislature to remove 5 applicants each from the pool of 200 applicants. I would not describe this authority as constituting an effective "legislative veto," much less an example of how the Legislature retains meaningful power over the commission. In addition, although the Court of Appeals is correct that the VNP proposal would not wrest complete power from the judicial branch, it *would* wrest from the judiciary its power to create its own redistricting plan. While I do not necessarily view this as a "bad" alteration of the Constitution, that is not the issue. Rather, it is whether this can be understood to constitute a "fundamental" reform of the Constitution. The majority does not answer this but instead concludes that the "Constitution offered this Court a limited array of options to review redistricting plans" and "VNP's proposal does likewise." However, the part of the "Constitution" that the majority refers to here is exactly that part that has been *struck down* by this Court. In

31

judgment, reflects a fundamental alteration in the relationship between the people and their representatives. Instead of 10 million Michigan citizens possessing some measure of influence over the system by which election districts are established in this state and citizens joined together or separated by political boundaries and the building blocks of our governing institutions determined, the VNP proposal would substitute the decision-making of 13 randomly selected citizens. And instead of the democratically elected representatives of these 10 million people having a constitutional role in this same process, the VNP proposal would substitute the decision-making of these self-same randomly selected citizens. And thus instead of this "foundation" power of redistricting being carried out by traditional institutions of American self-government, it will instead be carried out by an "independent" commission, utterly removed from the processes of self-government.

Furthermore, although this commission would nominally be placed within Article 4, describing the legislative branch of government, and invested with the legislative power of redistricting, it would nonetheless be "independent" from the Legislature. See VNP proposal, art 4, § 6(22) ("[T]he powers granted to the commission are legislative functions not subject to the control or approval of the Legislature, and are exclusively reserved to the commission."). For that reason, it is incumbent that VNP redefines, as it does, the threshold description of the "legislative power" in Article 4, § 1. That language

---

other words, instead of comparing the VNP proposal to existing laws that currently define this Court's authority with regard to redistricting, the majority compares the VNP proposal to an obsolete part of the 1963 Constitution, that is, a provision that for at least the past 36 years has been a *non-part* of that or any other constitution.

now reads, "The legislative power of the State of Michigan is vested in a senate and a house of representatives." It would be modified to read, "*Except to the extent limited or abrogated by* [the VNP proposal], the legislative power of the State of Michigan is vested in a senate and a house of representatives." (Emphasis added.) This is a change occasioned by the fact that one of the Constitution's three separated powers, the "legislative power," would be exercised by a body that is *neither* the "senate" nor the "house of representatives," but an "independent" commission. While this new language might avoid what would otherwise be an unconstitutional exercise of authority by the commission, that is *only* because such language alters the Constitution's fundamental expression of the legislative power.

Indeed, the proposal goes on to introduce the same prefatory language in Articles 5 and 6 of the Constitution, addressing respectively the executive and judicial powers of the Constitution,[20] each of which hitherto has remained essentially unchanged since our state's first constitution in 1835. All of which merely underscores that the impact of these changes is quite "fundamental." While it is reasonably clear that the new prefatory language set forth in Article 6 is designed to communicate that current understandings of

---

[20] Const 1963, art 5, § 1 would be modified to read, "*Except to the extent limited or abrogated by* [the VNP proposal], the executive power is vested in the governor," and Const 1963, art 6, § 1 would be modified to read, "*Except to the extent limited or abrogated by* [the VNP proposal], the judicial power of the state is vested exclusively in one court of justice . . . ." (Emphasis added.) Taken together, these redefinitions of the foundational articles and sections of our system of separated powers speak eloquently concerning the breadth of the changes being enacted by the VNP proposal. While the proposed changes may or may not ultimately prove sensible or prudent, they will almost certainly prove consequential, and *that* is what is at issue.

33

the "judicial power" are somehow to be altered, at a minimum by striking the present authority of the judiciary to initiate redistricting plans where necessary,[21] it is less clear why the prefatory language set forth in Article 5 is similarly required, although it must be presumed that this is because alterations in the exercise of the executive power are also contemplated, possibly in the extent of its ability to exercise its present veto authority[22] or its general supervisory authorities over the so-called administrative branch of government. I do not know exactly what was in the mind of the drafters of the VNP proposal in these regards, but we soon will doubtlessly be apprised of this in the course of litigation seeking to make clear how truly "independent" the VNP commission is of all checks and balances, and restraints, of the sort imposed upon every other institution of government. Whereas descriptions of the administrative state as a "fourth branch" may heretofore have been exaggerated, it is difficult to survey the express authorities and the

---

[21] Furthermore, the VNP proposal would require the commission to consider such factors as a "state's diverse population and communities of interest," which would include, but not be limited to, "populations that share cultural or historical characteristics or economic interests." VNP proposal, art 4, § 6(13)(C). The commission would also be required to "not provide a disproportionate advantage to any political party," which would be determined by using "accepted measures of partisan fairness." VNP proposal, art 4, § 6(13)(D). And the commission would be required to "not favor *or* disfavor an incumbent elected official or a candidate." VNP proposal, art 4, § 6(13)(E) (emphasis added). Moreover, this Court somehow would be required to review and ensure that the commission had complied with each of these "criteria" in its adoption of redistricting plans. Contrary to the majority's contention, the plain language of these criteria in no way resembles those criteria applicable to the short-lived 1963 constitutional commission or the criteria by which the Legislature currently abides.

[22] An authority wrongly characterized by VNP as a "legislative power" in their briefing to this Court.

34

constitutional placement of the VNP commission and not conclude that it is designed to be an "independent" body of a genuinely unique character.

In sum, Article 4, § 1, Article 5, § 1, and Article 6, § 1, the foundational articles of our system of separated powers, have each been modified in recognition of the authority bequeathed upon the new commission. While lawyers, scholars, and public officials may now be increasingly engaged in reconsidering the proper expanse of the administrative state-- its impact upon our three branches, understandings of governmental accountability to the citizenry, and the rule of law, Michigan now embarks upon the establishment of a super-administrative, or "independent," commission to carry out the foundational role of self-government. This measure is precisely of a kind that warrants the reflection, deliberation, and consensus decision-making of the convention processes of Const 1963, art 12, § 3.[23]

---

[23] The majority contends that it is appropriate to treat the VNP proposal as a voter-initiated "amendment" under Const 1963, art 12, § 2, in part, because in 1952 a voter-initiated amendment modified the Constitution to provide that "should the legislature within [a certain period of time] fail to apportion anew the representatives in accordance with the mandate of this article, the board of state canvassers, within [a certain period of time] shall apportion anew such districts in accordance with the provisions of this article . . . ." Const 1908, art 5, § 4. Putting aside for the moment the vast differences between these two proposals, the 1952 proposal was, to the best of my knowledge, never *challenged* on the basis that it was not a proper voter-initiated "amendment." The majority rejects proper judicial precedents in defining a standard for the consideration of voter-initiated amendments while invoking nonprecedents for illustrating what does and does not satisfy its own standard. Furthermore, the 1952 proposal was vastly different from the instant proposal. The 1952 proposal gave the power of redistricting to the board of state canvassers *only* if the Legislature failed to timely exercise that power, while the instant proposal would take the power of redistricting completely away from the Legislature and place it in the hands of an unprecedentedly "independent" redistricting commission.

What these three "[e]xcept to the extent limited or abrogated by" provisions most of all suggest is that the commission itself is an entirely novel institution that would fundamentally breach our Constitution's separation of powers, see Const 1963, art 3, § 2 ("The powers of government are divided into three branches; legislative, executive and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."), *but for* the addition of these three provisions.  Why would it be necessary to expressly redefine the wielder of each of our Constitution's three separated powers *unless* the VNP proposal was thought to implicate each of these?[24]  Yet, to the extent that the commission *would*,

---

[24] Indeed, even the majority admits that "by adding this language, the proposal makes explicit what would have been implicit without the language—the proposal does have some effect on the responsibilities and powers of the branches of government," but that effect, according to the majority, does not amount to a "substantial alteration in the form or structure of our government."  To say the least, I disagree with this latter conclusion and note that it is only reached after a comparison with a long-defunct commission that for a short time was part of the Constitution but has not been for at least 36 years and has not been operative for nearly half a century.  In order to assess the impact of a proposed constitutional change, and by that assessment determine whether the proposal effects a "fundamental" change or a change in accordance with the majority's own standard, the majority would do better to compare the proposal with the *actual* Constitution than to the once-upon-a-time constitution that produces the most favorable comparison.  "Changes" are generally assessed by how the *present*, the *status quo*, the *current* moment, the *here-and-now* is being affected by some new development, not by the irrelevant comparison engaged in by the majority.  Accordingly, the majority does not address the critical question, which is whether the VNP proposal would fundamentally alter the government as it *currently* operates.  Perhaps if the majority would have addressed this question, it would have agreed with this dissent that the proposal *does* fundamentally alter the government as it now operates.  Finally, to be clear, I do not agree with the majority's comparison, even on its own terms.  That is, the 1963 commission and the VNP commission bear little serious comparison with one another in terms of their scope, their "independence," and their relationship with either the other institutions of government or the "people" themselves.

in fact, wield these combined powers, it would not only be a unique constitutional institution, but in express breach of Const 1963, art 3, § 2, one of the several constitutional provisions *not* republished by VNP proponents.  See note 27 of this opinion.  Thus, this VNP commission would be as close to representing a "fourth branch" of government as any within our Constitution-- an "independent" body certainly, but more relevantly for purposes of constitutional analysis, an "unaccountable" body.[25]  The present issue, once again, is not the *wisdom* of the changes being made by the VNP proposal, but whether these changes are *fundamental*.  I believe that they are, even by the most rigorous understanding of what is and is not "fundamental" to our constitutional system of governance.[26]

## VII.  CONCLUSION

For these reasons, I conclude that the VNP proposal, if adopted, would fundamentally change the operation of our government and, as a result, it is not an "amendment" that can be properly placed on the ballot by the initiative process under Const 1963, art 12, § 2, but rather a general "revision" that requires resort to the

---

[25] "The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."  The Federalist No. 47 (Madison) (Rossiter ed, 1961), p 301.

[26] Concerning the quantitative nature of the changes effected by the VNP proposal, it would alter 11 sections within 3 articles of the Constitution, and it would add more than 3,000 words to the Constitution while deleting more than 1,000 other words.  While I am not of the view that there is some numerical threshold beyond which a proposal cannot qualify for ballot placement as an initiative, these figures concerning the VNP proposal certainly demonstrate a considerable quantitative effect on the Constitution.

convention process under Const 1963, art 12, § 3.[27]  It is precisely the kind of "alteration

of first governing principles" proposal that requires the opportunities for debate,

[27] Plaintiffs also argue that petition supporters (VNP) did not "comply with the requirement that the petition republish any existing constitutional provision that the proposed amendment, if adopted, would alter or abrogate." *Protect Our Jobs*, 492 Mich at 778; see also Const 1963, art 12, § 2; MCL 168.482(3).  Because I conclude that the proposal constitutes a revision rather than an amendment, and thus cannot be placed on the ballot for that reason, it is unnecessary for me to address this argument.  However, I do question whether VNP has fully complied with the republication requirement, and this *is* a necessary matter for consideration by the majority that would place the VNP proposal on the ballot.  In particular, Const 1963, art 9, § 17 provides, "No money shall be paid out of the state treasury except in pursuance of appropriations made by law."  Yet, the VNP proposal would require that "[t]he state of Michigan . . . indemnify commissioners for costs incurred *if the Legislature does not appropriate sufficient funds* to cover such costs."  VNP proposal, art 4, § 6(5) (emphasis added).  Would this provision require money to be paid out of the state treasury absent an appropriation?  If so, Const 1963, art 9, § 17 should have been republished and it was not.  For reasons set forth earlier in this opinion, I also question whether Const 1963, art 3, § 2, setting forth the separation-of-powers principle of our state's Constitution should not have been republished.  Finally, I question whether Const 1963, art 11, § 1 should have also been republished.  It provides:

> All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of …………. according to the best of my ability.  *No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust.*  [*Id.* (emphasis added).]

Yet, the VNP proposal would require "applicants to *attest under oath* that they meet the qualifications set forth in this section; and either that they affiliate with one of the two political parties with the largest representation in the Legislature (hereinafter, 'major parties'), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties."  VNP Proposal, art 4, § 6(2)(A)(III) (emphasis added).  Would this provision require an *additional* oath as a qualification for any office or public trust?  If so, Const 1963, art 11, § 1 should also have been republished and it was not.

modification, give-and-take, and compromise that are only available in the convention process. It is not the kind of proposal that the electorate should be required to "take or leave" as they cast their votes over the course of the next 90 days after digesting a "100-word or less" summary. That is, it is not the kind of proposal under our Constitution that is appropriate for the "amendment" process. Therefore, I respectfully dissent from this Court's decision to affirm the judgment of the Court of Appeals.

Stephen J. Markman
Brian K. Zahra
Kurtis T. Wilder

---

Thus, three significant constitutional provisions should arguably have been republished, and they were not.

STATE OF MICHIGAN

SUPREME COURT

CITIZENS PROTECTING MICHIGAN'S
CONSTITUTION, JOSEPH SPYKE, and
JEANNE DAUNT,

       Plaintiffs-Appellants,

v

No. 157925

SECRETARY OF STATE and BOARD OF
STATE CANVASSERS,

       Defendants/Cross-Defendants-
       Appellees,

and

VOTERS NOT POLITICIANS BALLOT
COMMITTEE, d/b/a VOTERS NOT
POLITICIANS; COUNT MI VOTE, d/b/a
VOTERS NOT POLITICIANS; KATHRYN
A. FAHEY; WILLIAM R. BOBIER; and
DAVIA C. DOWNEY,

       Intervening Defendants/Cross-
       Plaintiffs-Appellees.

_____

WILDER, J. (*dissenting*).

I concur in full with Chief Justice MARKMAN's dissent. I write separately,
however, to address an additional, alternative basis for rejecting the proposal submitted
by Voters Not Politicians (VNP). The VNP proposal requires that applicants to the
independent citizens redistricting commission attest under oath either that they affiliate or
do not affiliate with one of the two major political parties. Because the proposal

abrogates the Oath Clause of Const 1963, art 11, § 1, which forbids requiring additional oaths or affirmations as a qualification for public office, VNP was required to republish that provision on its petitions. It is uncontested that VNP failed to do so. Because strict compliance with the republication requirement was required, an order of mandamus should issue directing the rejection of the VNP proposal.[1]

## I. THE VNP PROPOSAL[2]

The VNP proposal, art 4, § 6, provides, in pertinent part:

> (2) Commissioners *shall be selected* through the following process:
>
> (A) The Secretary of State shall do all of the following:
>
> *   *   *
>
> (III) require applicants to *attest under oath* that they meet the qualifications set forth in this section; *and either that they affiliate with one of the two political parties with the largest representation in the Legislature (hereinafter, "major parties"), and if so, identify the party with which they affiliate, or that they do not affiliate with either of the major parties.* [Emphasis added.][3]

---

[1] Appellants raised three additional constitutional provisions that they claim would be abrogated by the VNP proposal and were not republished with the circulated VNP petition: Const 1963, art 9, § 17 (concerning appropriations); Const 1963, art 1, § 5 (concerning free speech); and Const 1963, art 6, § 13 (conferring original jurisdiction on the circuit courts). Because I believe that substantial questions have been raised regarding the abrogation of Const 1963, art 11, § 1, and that this abrogation appears to be sufficient by itself to reverse the decision of the Court of Appeals, I do not address the other three constitutional provisions.

[2] In the proposal, language being added to the Constitution is shown in all capital letters. That capitalization has been altered when quoted in this opinion to make reading the proposed language easier.

[3] The commissioner qualifications are listed in VNP proposal, art 4, § 6(1). "Each commissioner shall" be registered to vote in Michigan, otherwise not disqualified for appointed or elected office by the Michigan Constitution, and not currently, or in the past

2

Under the VNP proposal, the Secretary of State is required to eliminate the applications that are incomplete. Therefore, if an applicant fails to attest under oath regarding his or her political party affiliation, the applicant is ineligible to be selected for a position on the commission. See VNP proposal, art 4, § 6(2)(D)(I).

## II. BACKGROUND REGARDING REPUBLICATION REQUIREMENTS

Both Const 1963, art 12, § 2[4] and MCL 168.482(3)[5] require that ballot proposals that would amend Michigan's Constitution republish any existing constitutional provisions that the proposed amendment would alter or abrogate. The petition republication requirement serves "to inform the petition-signer, should he sign," of the effect "an initiated proposal will have upon an existing constitutional provision (or provisions) should that proposal receive electoral approval." *Carman v Secretary of*

---

6 years have been (or related to anyone who has been) (1) a declared candidate, elected official, or part of a governing body for federal, state, or local office; (2) a paid consultant or employee of any elected official, political candidate, or political action committee; (3) a legislative employee; (4) a registered lobbyist; or (5) an unclassified state employee.

[4] Const 1963, art 12, § 2 provides that petitions "shall be in the form, and shall be signed and circulated in such manner, as prescribed by law." That section subsequently provides that "[s]uch proposed [constitutional] amendment, existing provisions of the constitution which would be altered or abrogated thereby, and the question as it shall appear on the ballot shall be published in full as provided by law." *Id*.

[5] MCL 168.482(3) provides, in relevant part:

> If the proposal would alter or abrogate an existing provision of the constitution, the petition shall so state and the provisions to be altered or abrogated shall be inserted, preceded by the words:
>
> "Provisions of existing constitution altered or abrogated by the proposal if adopted."

3

*State*, 384 Mich 443, 454; 185 NW2d 1 (1971) (emphasis omitted). Such "dissemination of necessary information to the public" is considered both "wholesome and desirable." *Id*. "Const 1963, art 12, § 2 and MCL 168.482(3) together establish the requirements for publishing existing constitutional provisions." *Protect Our Jobs v Bd of State Canvassers*, 492 Mich 763, 778; 822 NW2d 534 (2012).

In *Stand Up For Democracy v Secretary of State*, 492 Mich 588; 822 NW2d 159 (2012), this Court held that a petition must fully observe mandatory statutory provisions concerning a petition's form requirements. In *Protect Our Jobs*, 492 Mich at 778, this Court held that the strict-compliance principle articulated in *Stand Up For Democracy* applied with "equal force" to the requirement that a petition republish any existing constitutional provision that the proposed amendment, if adopted, would alter or abrogate.

*Protect Our Jobs*, which involved the proper interpretation of "alter" and "abrogate" in the context of a ballot proposal to amend the Constitution, *id*. at 772-773, reaffirmed the principles articulated in *Ferency v Secretary of State*, 409 Mich 569; 297 NW2d 544 (1980), and *Sch Dist of City of Pontiac v City of Pontiac*, 262 Mich 338; 247 NW 474 (1933), *Protect Our Jobs*, 492 Mich at 778-781. "[A]n existing provision is only altered when the amendment actually adds to, deletes from, or changes the wording of the provision," and "an amendment only abrogates an existing provision when it renders that provision *wholly inoperative*." *Protect Our Jobs*, 492 Mich at 773 (emphasis added).

With respect to abrogation—the only type of change asserted to be at issue by plaintiffs in the instant case—*Protect Our Jobs* held that republication is required if the

proposed change "would essentially eviscerate an existing provision." *Id*. at 782. The standard for abrogation was articulated as follows:

> Our caselaw establishes that an existing provision of the Constitution is abrogated and, thus, must be republished if it is rendered "wholly inoperative." An existing constitutional provision is rendered wholly inoperative if the proposed amendment would make the existing provision a nullity or if it would be impossible for the amendment to be harmonized with the existing provision when the two provisions are considered together. That is, if two provisions are incompatible with each other, the new provision would abrogate the existing provision and, thus, the existing provision would have to be republished. An existing provision is not rendered wholly inoperative if it can be reasonably construed in a manner consistent with the new provision, i.e., the two provisions are not incompatible.
>
> Determining whether the existing and new provisions can be harmonized requires careful consideration of the actual language used in both the existing provision and the proposed amendment. An existing provision that uses nonexclusive or nonabsolute language is less likely to be rendered inoperative simply because a proposed new provision introduces in some manner a change to the existing provision. Rather, when the existing provision would likely continue to exist as it did preamendment, although it might be affected or supplemented in some fashion by the proposed amendment, no abrogation occurs. *On the other hand, a proposed amendment more likely renders an existing provision inoperative if the existing provision creates a mandatory requirement or uses language providing an exclusive power or authority because any change to such a provision would tend to negate the specifically conferred constitutional requirement.* [*Id*. at 782-783 (citations omitted; emphasis added).]

*Protect Our Jobs* involved four distinct ballot proposals to amend the Michigan Constitution, none of which altered an existing provision of the Constitution. However, the Court held that the ballot proposal at issue in *Citizens for More Michigan Jobs v Secretary of State* abrogated an existing constitutional provision. *Id*. at 773. That proposed amendment would have allowed for the construction of eight new casinos in

5

Michigan and would have compelled the issuance of a liquor license to each of the eight casinos. *Id.* The Court held that the amendment's requirement that the casinos "shall be granted" liquor licenses "render[ed] wholly inoperative the 'complete control of the alcoholic beverage traffic within this state' afforded to the Liquor Control Commission under . . . Const 1963, art 4, § 40." *Id.* Because Article 4, § 40 was required to be republished, the fact that it was not was "fatal to the proposed amendment" and mandamus was denied. *Id.* at 791.

### III. THE OATH CLAUSE

Const 1963, art 11, § 1 provides:

> All officers, legislative, executive and judicial, before entering upon the duties of their respective offices, shall take and subscribe the following oath or affirmation: I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of ……………. according to the best of my ability. *No other oath, affirmation, or any religious test shall be required as a qualification for any office or public trust.* [Emphasis added.][6]

Throughout Michigan history, this constitutional provision has largely remained the same. Const 1835, art 12, § 1; Const 1850, art 18, § 1; and Const 1908, art 16, § 2 all provided that "[n]o other oath, declaration or test shall be required as a qualification for

---

[6] There is no question that the VNP proposal contemplates that redistricting commissioners would hold "office." See VNP proposal, art 4, § 6(3) (stating that "commissioners shall hold *office* for the term set forth in part (18) of this section" and that "[a] commissioner's *office* shall become vacant upon the occurrence of any of the following," including "gross misconduct in *office*" and "inability to discharge the duties of *office*") (emphasis added).

6

any office or public trust." Const 1963, art 11, § 1 narrowed the provision from "test" to "any religious test."

In *Dapper v Smith*, 138 Mich 104; 101 NW 60 (1904), the issue before the Court was the constitutionality of a Kent County law that denied a spot on the ballot to any candidate unless the candidate declared an oath of the fact that he was a candidate for the office. The oath prohibited voters from choosing a candidate who declined to seek office on his own initiative but was "willing to consent to serve his State or his community in answer to the call of duty when chosen by his fellow citizens to do so . . . ." *Id*. at 105. The Court noted that the constitutional provision was "not one designed for the benefit of the aspirant for public station alone; it is in the interest of the electorate as well." *Id*. The Court found the law was unconstitutional, in violation of Article 18, § 1, which provided that "no other oath, declaration, or test shall be required as a qualification for any office or public trust." *Id*. at 105-106. The Court could not "escape the conclusion that the provision in question does most seriously impede the electors in the choice of candidates for office, *and that it is in conflict with the provisions of section 1 of article 18 of the Constitution*." *Id*. (emphasis added).

In *Harrington v Secretary of State*, 211 Mich 395, 395-396; 179 NW 283 (1920), the Court relied on *Dapper* to strike down a statutory amendment that required primary candidates to sign an affidavit stating that the candidate was a member of a certain political party, naming the political party, and indicating that the candidate would "support the principles of that political party of which he is a member, if nominated and elected[.]" (Quotation marks and citation omitted.) The Court noted the fallacy of requiring additional oaths before a candidate even becomes a candidate: "Where is the

7

logic of saying that when elected the officer cannot be subjected to any test oath other than the constitutional oath of office, but before he can be a candidate he must subject himself to a different test oath or he cannot be a candidate, and is therefore in practical effect barred from holding the office?" *Id*. at 397. The Secretary of State urged that *Dapper* be overruled, but the Court declined, concluding that "the amendment contravenes the constitutional provision above quoted." *Id*. at 399.

## IV. ANALYSIS

In the instant case, the Court of Appeals panel agreed with plaintiffs that the VNP proposal is "not an oath of office, but is merely an affirmation that the applicant satisfies the commissioner qualifications, which are enumerated in a separate section, § 6(1)," reasoning that *Advisory Opinion on Constitutionality of 1975 PA 227*, 396 Mich 465, 510; 242 NW2d 3 (1976), supported this conclusion. *Citizens Protecting Michigan's Constitution v Secretary of State*, ___ Mich App ___, ___; ___ NW2d ___ (2018) (Docket No. 343517) (*CPMC*); slip op at 27. In that case, the Court held that a financial disclosure oath did not violate Article 11, § 1; rather, it was more akin to nominating petition affidavits under MCL 168.558 and former MCL 168.557. *Advisory Opinion*, 396 Mich at 510-511. However, the plain language of the VNP proposal requires applicants to attest under oath that they meet the qualifications "set forth in this section; *and*" indicate their party affiliation, if any. VNP proposal, art 4, § 6(2)(A)(III) (emphasis added). The political party affiliation question is undoubtedly a requirement of the attestation under oath in addition to the qualifications of § 6(1). The Court of Appeals, without explanation, simply declared that a financial disclosure oath is analogous to a

8

political affiliation attestation, and in doing so, it ignored language from *Advisory Opinion* that distinguished *Dapper* and *Harrington* and is particularly germane to this case:

> Essentially in both *Dapper v Smith* and *Harrington v Secretary of State*, the Court upheld the right of belief of the citizen *in the face of the government attempt to force the citizen to make a decision*. In *Harrington*, the Court held that the government could not force a potential candidate to choose a political philosophy. In *Dapper*, *the potential candidate could not even be forced to decide if he wanted to be a candidate*. The situation we have in this case is vastly different from that in *Dapper* and *Harrington*. Sections 131 and 132 [of 1975 PA 227] *do not require the potential candidate to form a belief or choose between differing thoughts*. The financial disclosure requirements are not analogous to the filing of an oath, affirmation, or religious test. We believe they are more analogous to affidavits required by MCLA 168.557 (change of name) and MCLA 168.558 (name, address, residency, etc.). We find no violation of art 11, § 1 by §§ 131 and 132. [*Advisory Opinion*, 396 Mich at 510-511 (citations omitted; emphasis added).]

In this case, the Court of Appeals' analysis made no reference to *Dapper* whatsoever. Moreover, the panel distinguished *Harrington* on the basis that in its view, "the oath required by the VNP Proposal relates only to the information on the application and *does not bind a candidate once he or she becomes a commissioner*." *CPMC*, ___ Mich App at ___; slip op at 27 (emphasis added). However, whether the oath in the instant case, unlike *Harrington*, does not purport to bind a candidate into the future has no bearing on whether an oath or affirmation exists as a qualification for office in the first instance. Nothing in the language of Article 11, § 1 limits the provision to "binding" oaths, affirmations, or religious tests.[7] Rather, the language of Article 11, § 1 bars

---

[7] While VNP's oath does not purport to bind a candidate's political affiliation into the future, we note that it would defeat the stated purpose of this independent "non-partisan"

9

additional oaths or affirmations as a *requirement* for office—"[n]o other oath, affirmation, or any religious test shall be required *as a qualification* for any office or public trust." (Emphasis added.)

The plain language of the VNP proposal requires applicants to make a choice when filling out the application—they must attest under oath that they affiliate with the Democratic Party, Republican Party, or indicate that they affiliate with neither party. If the applicant fails to meet this qualification, the application is discarded and the applicant is rendered categorically ineligible for a commissioner position. As this Court stated in *Advisory Opinion*, *Dapper* and *Harrington* stand for the proposition that Article 11, § 1 precludes *any* requirement that requires a potential candidate to form a belief or choose between differing thoughts as a qualification for office. Under *Dapper* and *Harrington*, commissioner applicants may not be forced to attest, under oath, to which political party they most closely affiliate with, if any.

VNP cites two cases for the proposition that "appointment to public bodies" may be based upon "consideration of political affiliation in cases where the requirement in question is designed to ensure representation of diverse political interests, and does not exclude persons of any particular political persuasion from participation." In other words, defendants argue that the plain language of Article 11, § 1 may be set aside in the interests of political diversity. However, these cases are easily distinguishable.

---

commission if it were to be dominated with commissioners from one side of the political aisle simply because misrepresentations were made during the application process. An enduring oath would preclude this from occurring and would be consistent with the stated purposes of VNP.

VNP first cites *Attorney General ex rel Connolly v Reading*, 268 Mich 224; 256 NW 432 (1934). In that case, electors of the city of Detroit sought a writ of mandamus to compel the city election commission to comply with a law requiring that not more than 50% of the election inspectors be of the same political party. *Id*. at 226. The election commissioners refused to comply with the law, claiming that it was an unconstitutional test.[8] *Id*. The Court rejected the commissioners' argument. *Id*. at 232. In doing so, the Court quoted Volume 20 of the Corpus Juris, which (citing *Attorney General v Bd of Councilmen of the City of Detroit*, 58 Mich 213; 24 NW 887 (1885)) stated that " 'such provisions have been held unconstitutional as making political opinions a condition to holding public office, but in [other jurisdictions] where the question has been raised it has been held that such provisions do not establish such a political test of office as is repugnant to the Constitution but . . . *rather a rule for the guidance of the appointing power*.' " *Id*. at 227-228 (emphasis added). The Court distinguished the statutory language pertaining to election inspectors from the language at issue in the Corpus Juris, *Dapper*, and *Harrington*, but found it "identical" to the language in numerous other statutes creating various other boards. *Id*. at 228-229. Instead of requiring a person to declare a party affiliation in order to be an election inspector, the statute was similar to

---

[8] As noted above, Article 16, § 2 of the 1908 Constitution then provided "No other oath, declaration or test shall be required as a qualification for any office or public trust." The provision has since been amended to limit "*test*" to "*any religious test*."

11

other statutes requiring "that candidates for election to any certain public office shall be limited to a certain number from each political party." *Id*. at 231.[9]

*Connolly* thus had nothing whatsoever to do with oaths or affirmations—the language of the statute at issue did not require anyone to make an oath or affirmation—and the case does not support VNP's claim that its proposal does not abrogate Article 11, § 1.

The other case cited by defendants is *Attorney General ex rel Fuller v Parsell*, 99 Mich 381; 58 NW 335 (1894). In that case, the attorney general filed a quo warranto action against Eugene Parsell, the warden of the state house of correction and reformatory at Ionia. *Id*. at 382. Parsell refused to give up his office even after he was removed by the board of control.[10] *Id*. Parsell raised six points in defense of the quo warranto action against him; the second point is the one most relevant to this case and reads as follows:

> In his second rejoinder he alleges, substantially, that after the passage of Act No. 118 [of the Public Acts of 1893], the Governor, by virtue of said act, assumed to appoint the board of control, requiring of each member thereof the political test named and mentioned in section 2, and by reason thereof appointed two Republicans and one Democrat,—the said Governor himself being *ex officio* member of said board, and also being a Republican,—and that the said Governor would not have appointed the Democratic member of said board had he been a Republican, or the

---

[9] In light of the language of Const 1963, art 11, § 1 being changed from "test" to "any religious test," I believe that it is perfectly permissible to inquire about political affiliation, particularly for a bipartisan board position. What does not appear to be permissible, and appears incompatible with the plain language of Article 11, § 1, is requiring an *oath* concerning political affiliation.

[10] A new warden, Otis Fuller, had been appointed by the board, and Fuller had to file a writ of mandamus against the attorney general to force the filing of a quo warranto action against Parsell. See *Fuller v Attorney General*, 98 Mich 96; 57 NW 33 (1893).

Republican members had they been Democrats, but that he made said appointment of these parties upon said board because of their political belief and for political reasons; and as to this the respondent puts himself upon the country. [*Id*. at 383-384.]

The Court rejected his claim as follows:

> The issue made by the second rejoinder is one purely of law, and raises the question of the constitutionality of Act No. 118, Laws of 1893. The constitutionality of the act was passed upon in *Fuller v Attorney General*, and the act held valid. It is true the exact point made here was not presented in that case, but we see no reason for holding it unconstitutional for the reasons assigned. It is now contended that because the Governor, in making the appointments on a new board, acting under section 2 of the act, appointed from each political party, such appointments are void. That section provides that the board shall consist of three members, to be appointed by the Governor, and not more than two of such members so appointed shall be of the same political party. The Governor, by the same section, is made *ex officio* member of the board. This provision of the act, we think, was passed for a salutary purpose, and was within the province of the Legislature. We know of no provision of the Constitution of the State which it violates. The Governor was bound by this section to appoint each member of the board, and, in making the selection, to choose no more than two from the same political party. This provision was carried out, as admitted by the respondent. It is true that the appointments may have been made for political purposes, and because of the political beliefs of the parties appointed; but this could not make the appointments void, and no issue of fact could be framed thereon. But, if this were not so, the title to their office cannot be attacked here. They are at least *de facto* officers. [*Id*. at 387-388.]

Of interest, it should be noted that Parsell did not claim a violation of Const 1850, art 18, § 1, the predecessor of Const 1963, art 11, § 1. Indeed, there was not even a claim that the board members were required to swear additional oaths or affirmations as a qualification of their appointment. In short, *Parsell* had nothing to do with the constitutional provision at issue and is wholly irrelevant to the analysis.

13

The majority argues on VNP's behalf that the oath here is merely a qualification for office. In the context of the "test" prohibition contained in former versions of Article 11, § 1, our caselaw has long held that having "special qualifications" for an office (e.g., requiring that a candidate live in a municipality for a specified period of time or be a member of the state bar) does not violate this particular constitutional provision. See *Attorney General v Macdonald*, 164 Mich 590; 129 NW 1056 (1911). In the context of the "oath" prohibition, this Court has acknowledged that a statutory requirement that a candidate for office of county commissioner of schools file an affidavit or other proof showing his eligibility for such office did not conflict with the "no other oaths" language of the Constitution. *Tedrow v McNary*, 270 Mich 332, 335; 258 NW 868 (1935). The affidavit in *Tedrow* passed constitutional muster because it was "simply *prima facie* evidence that the candidate [was] educationally qualified to discharge the duties of the office. No statement in any way affecting his rights as a citizen, or his religious or political affiliations, need appear therein." *Id*. The VNP proposal impermissibly inquires into the political affiliations of the oath-taker, and therefore, in my judgment, *Tedrow* does not support the conclusion that the VNP oath may be characterized as merely another qualification.

As the majority points out, judicial candidates must confirm by affidavit their qualifications for office. The affidavit of candidacy largely reflects a list of special qualifications: that the judge (1) is an incumbent judge and is domiciled within the relevant jurisdiction, (2) is a candidate for that office at the primary election, (3) is licensed to practice law in the state of Michigan, (4) has been admitted to the practice of law for at least five years, and (5) will not have attained the age of 70 years by election

day. See Const 1963, art 6, § 19; MCL 168.544b. Again, these qualifications, like the education qualification in *Tedrow*, stop short of inquiring into a candidate's political affiliations and therefore are distinguishable from the VNP oath.

Perhaps *most* persuasive is the fact that VNP has not characterized its oath as a qualification. That is a characterization argued by the majority on behalf of VNP. The VNP proposal considers the oath separately and distinctly from the qualifications for a commissioner's position. The commissioner qualifications are listed in Article 4, § 6(1) of the VNP proposal: "[e]ach commissioner shall" be registered to vote in Michigan, not otherwise disqualified for appointed or elected office by the Michigan Constitution, and not currently, or in the past 6 years have been (or related to anyone who has been) (1) a declared candidate, elected official, or part of a governing body for federal, state, or local office; (2) a paid consultant or employee of any elected official, political candidate, or political action committee; (3) a legislative employee; (4) a registered lobbyist; or (5) an unclassified state employee. The VNP oath requirement is placed in the next subsection, VNP proposal, art 4, § 6(2), which outlines the commissioner selection process.

The VNP oath may be more accurately characterized as a political test, but at any rate it is certainly an oath—which in my view directly conflicts with the plain letter of the Constitution. Const 1963, art 11, § 1 is crystal clear—"[n]o other oath [or] affirmation . . . shall be required as a qualification for any office or public trust." This appears to be absolute language. Because Const 1963, art 11, § 1 places an absolute ban on additional oaths or affirmations required as a qualification for office, it is analogous to an existing provision that "creates a mandatory requirement or uses language providing an exclusive power or authority because any change to such a provision would tend to

15

negate the specifically conferred constitutional requirement." *Protect Our Jobs*, 492 Mich at 783. Equally as important, Article 11, § 1 is unlike an existing provision "that uses nonexclusive or nonabsolute language" deemed "less likely to be rendered inoperative" in *Protect Our Jobs*. *Protect Our Jobs*, 492 Mich at 783. Because the VNP proposal, which requires applicants to attest under oath regarding their political affiliation, appears to render the absolute language of Article 11, § 1 "wholly inoperative," *Protect Our Jobs*, 492 Mich at 773, it therefore constitutes an abrogation that is subject to the republication requirements of Const 1963, art 12, § 2 and MCL 168.482(3).[11]

## V. CONCLUSION

The VNP proposal requires that applicants to the independent citizens redistricting commission attest under oath that they either affiliate or do not affiliate with one of the

---

[11] VNP contends that strict enforcement of the republication requirement of MCL 168.482(3) would be unconstitutional and that substantial compliance with this requirement by publication of the Oath Clause of Const 1963, art 11, § 1 after certification of the proposal for the ballot would be sufficient. However, Const 1963, art 12, § 2 permits the Legislature to "prescribe" "the form" of petitions. "The Legislature accepted the Constitution's invitation to set forth publishing requirements for petitions," *Protect Our Jobs*, 492 Mich 778, and does not limit the ability to abrogate any provision of the Constitution, but merely requires republication of that provision if it is to be abrogated. There is nothing unconstitutional about this "form" requirement. Moreover, as this Court made clear in *Stand Up for Democracy*, 492 Mich at 602 (opinion by MARY BETH KELLY, J.), petitions for constitutional amendments must "strictly comply with the form and content requirements of the statute." We reaffirmed that "the principle articulated in *Stand Up* [of strict compliance with the republication requirement] applie[d] with equal force" in *Protect Our Jobs*. *Protect Our Jobs*, 492 Mich at 778. Therefore, VNP's assertion that substantial compliance is appropriate is not supported by our precedent.

16

two major political parties.  Because the proposal would abrogate the Oath Clause of Const 1963, art 11, § 1, which forbids requiring additional oaths or affirmations as a qualification for public office, VNP was required to republish that provision on its petitions, as required by Const 1963, art 12, § 2 and MCL 168.482(3).  It is uncontested that VNP failed to do so.  Because strict compliance with the republication requirement was required, an order of mandamus should issue directing the rejection of the VNP proposal.

Kurtis T. Wilder
Brian K. Zahra
